Argued and submitted April 5, reversed and remanded with instructions May 22,
reconsideration denied July 12, petition for review denied September 17, 1985
(300 Or 64)

WYSS,
*Appellant - Cross-Respondent,*

*v.*

INSKEEP et al,
*Respondents - Cross-Appellants.*

(A8208-05304; CA A31048)

699 P2d 1161

James H. Clarke, Portland, argued the cause for appellant - cross-respondent. With him on the briefs were Spears, Lubersky, Campbell, Bledsoe, Anderson & Young, Guy J. Rappleyea, David P. Roy and Black, Helterline, Beck & Rappleyea, Portland.

Susan P. Graber, Portland, argued the cause for respondents - cross-appellants. With her on the brief was Stoel, Rives, Boley, Fraser & Wyse, Portland.

Before Gillette, Presiding Judge, and Richardson and Warden, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

Plaintiff appeals from a judgment n.o.v. for defendants. The judgment overturned a jury verdict which awarded plaintiff $50,000 for the failure of defendant Columbia Management Co. (Columbia) to pay him a bonus for the last part of 1981. As part of his bonus claim, plaintiff also sought statutory penalties and attorney fees; he also appeals the trial court's partial summary judgment against him on those claims. Defendants assert on cross-appeal that the trial court's award of attorney fees to them for their successful defense of plaintiff's claim for specific performance of a buy-sell agreement covering his Columbia stock was too low.[1] We reverse and remand on the appeal and affirm on the cross-appeal.

Because the jury found for plaintiff on the bonus claim, we state the facts most favorably to his position. Plaintiff was one of the founders of Columbia and was a Senior Vice President and the corporate Secretary-Treasurer from Columbia's founding until the end of 1981. He remains the third largest stockholder. Defendant J. Jerry Inskeep, Jr., has been Chairman and defendant James F. Rippey has been President of Columbia from the organization of the company in 1969 to the present. Together, Inskeep and Rippey own a majority of the stock; they have effectively controlled the company. Columbia manages the portfolio of a number of large investors, primarily institutions. Those investors include a mutual fund and a money market fund which Columbia founded and which provide it with a significant portion of its profits. By the trial in October, 1983, Columbia had grown from its small beginnings to be the largest investment management company in the Northwest, managing over two billion dollars in assets.

As Columbia grew, its management became concerned about the need to attract and retain competent employes in a highly competitive environment. Because its business was subject to potentially severe fluctuations in profitability, Inskeep, who was responsible for administering

---

[1] The individual defendants are the other stockholders of Columbia and the other parties to the buy-sell agreement. Plaintiff's claim for specific performance was tried to the court, which found for defendants. Plaintiff does not appeal that finding. The agreement contained a provision allowing the prevailing party to recover attorney fees.

the company, considered it dangerous to rely on fixed salaries as the primary method of increasing compensation. Instead, he suggested, at a special board meeting on March 10, 1976, that there be a bonus plan tied to Columbia's pre-tax profits. The minutes contain his explanation of the reasons for his proposal and the board's reaction:[2]

> "Mr. Inskeep expressed his concern about preserving the company's chief assets — officers and key people responsible for the affairs of Columbia Management Co. He pointed out that the investment management business is absolutely dependent upon the ability of its people to make sound judgments. That ability is partly talent but it is also a skill developed through long experience working as analyst, portfolio manager, administrator or marketing specialist. Yet, the value of Columbia Management Co. is more than the sum of its people. These people work smoothly together and offer a better service together than alone, and most successful organizations reach a level of effectiveness as a group which individuals may never reach alone. In doing so, group members rely very heavily upon one another's judgment to reach their decisions. Because of the critical nature of this association, losing a member of the group is more serious than in most occupations, and, since other advisors operate in the same way, it is difficult and expensive to attract competent replacements from competitors who carefully guard their own personnel.

> "He pointed out that there are few employers interested in hiring inexperienced personnel who learn by making mistakes, so that replacement choices are few and very expensive when available. Therefore, in order to insure that the personnel of Columbia Management Co. remain as permanent employees and perform the continuous extraordinary efforts required to manage the affairs of the company, and in order to be in a position to attract competent and talented new personnel, he proposed the establishment of a management incentive plan based upon an aggregate management bonus to be distributed by the Board of Directors. There ensued considerable discussion by all of the Directors, with complete agreement that such a bonus would be necessary and desirable."

After its discussion, the Board, on plaintiff's motion, adopted a written management bonus plan. The purpose of

---

[2] Plaintiff, as corporate secretary, prepared the minutes of this meeting.

the plan was "to insure that the personnel of CMC will remain in the employment of CMC as permanent employees and that they will continue to provide the continuous extraordinary effort and abilities necessary for the successful operation of the company." The plan was also designed to attract "trained and qualified additional personnel" to become permanent Columbia employes. The plan was "for the benefit of the officers of CMC and other persons sufficiently responsible for the affairs of the company and its income * * *." Under the plan a bonus pool was to be established each year, based on the company's net income before taxes. Under the formula in the plan, 70 percent of all net income over $80,000, and smaller percentages of income below that level, were placed in the pool. The allocation of the pool among those eligible "shall be determined in good faith by the Board of Directors, so as to attain the purposes of this Plan." The amount to be allocated to the pool, however, was fixed by the formula in the plan.

The first bonuses paid under this plan were for 1976. There were sizable payments each year thereafter. The total pool, and plaintiff's bonuses, increased each year. In practice Inskeep and Rippey, as the Board's executive committee,[3] divided the pool without any involvement from the other Directors. Although the plan provided for one bonus, the company soon began to distribute the bonus three times a year instead of once. The third distribution was allocated in December but was not paid until January 1 of the next year.[4] Inskeep, Rippey and plaintiff uniformly received three of the highest four bonuses. In plaintiff's last years with the company, he received significantly more in bonus payments than in salary.

Plaintiff's relationship with Inskeep and, to a lesser extent, with Rippey began to deteriorate in the late fall of 1981. The reasons and the specific events are in dispute, but the jury could have found that Inskeep was upset at plaintiff's objection to a proposed revision of the buy-sell agreement among Columbia's stockholders. Plaintiff thought that the proposed revisions were too favorable to Inskeep and Rippey

---

[3] They were formally given this status immediately after the adoption of the bonus plan. However, they had functioned as the *de facto* executive committee for some time before then.

[4] These changes in payment were primarily to give the employes tax benefits.

at the expense of the other stockholders. The jury could also have found that Inskeep's resentment led him to object vehemently to plaintiff's charging a small fee for a speech which he agreed to give to a group headed by a friend of Inskeep's. The encounter over that issue soured the atmosphere between Inskeep and plaintiff. In early December, 1981, Inskeep complained to plaintiff, for the first time, about his performance of his research and portfolio management responsibilities. Rippey, who was also at the meeting, concurred with Inskeep. A day or two later Inskeep told plaintiff that he and Rippey had decided that plaintiff should leave the company. Plaintiff's departure was announced to the Board at its December 17, 1981, meeting. The jury could have found that plaintiff was fired. Plaintiff worked through the end of the month, being the last person to leave the office on December 31, 1981.

Plaintiff's salary for 1981 was $75,000. In addition, he received distributions of $50,000 from each of the first two bonus pools for that year. Inskeep and Rippey allocated the third bonus on December 14, 1981, after their decision to fire plaintiff. The bonus was paid in early January, 1982. The allocations were generally consistent with previous distributions, except that plaintiff received nothing.

Plaintiff in his third claim for relief sought $79,615 for his share of the third bonus pool. The jury awarded him $50,000. The court granted defendants a judgment n.o.v. on the grounds that the bonus plan was insufficiently certain to constitute a binding contract and that it did not provide the jury with a basis for awarding damages. The questions on appeal are whether the jury could find that plaintiff had a contractual right to a share of the third bonus pool and, if so, whether there was a basis for the jury to determine the amount of plaintiff's damages for Columbia's failure to give him a share.

■ Compensation for an employe's services often includes much more than the base wage or salary. Such fringe benefits as vacations, pensions and bonuses may constitute significant portions of the total compensation package. If normal requirements for the creation of a contract are met, an employer's promise to pay such fringe benefits is as binding as is a promise to pay hourly wages or a salary. *Rose City Transit*

*v. City of Portland,* 271 Or 588, 593, 533 P2d 339 (1975) (pensions); *Thompson v. Burr,* 260 Or 329, 490 P2d 157 (1971) (bonus); *State ex rel Nilsen v. Ore. Motor Ass'n,* 248 Or 133, 432 P2d 512 (1967) (vacation); *Harryman v. Roseburg Fire Dist.,* 244 Or 631, 420 P2d 51 (1966) (sick leave). Defendants assert that the Columbia bonus plan has no contractual force, because it gives the Board of Directors total discretion whether to grant a bonus and in what amount. This discretion, defendants argue, makes any apparent promise in the plan illusory. Defendants further assert that, even if the plan contains a promise, it is impossible to determine the amount of the bonus with sufficient certainty to support an award of damages. The alleged contract is, therefore, unenforceable due to its indefiniteness.

■ Columbia adopted the bonus plan in order to retain higher-level employes, like plaintiff, who it believed played a major role in its success. The promises the plan made were to them, and the benefit it provided Columbia was their continued service. If they continued their employment with knowledge of its existence, the plan became part of their employment contracts. *Yartzoff v. Democrat-Herald Publishing Co.,* 281 Or 651, 656-57, 576 P2d 356 (1978). Although plaintiff in fact knew the terms of the plan, it was not necessary that he do so for the plan to become part of his employment contract. All that was necessary was that the terms of the plan were capable of ascertainment and that plaintiff knew that there was a plan. *Rose City Transit v. City of Portland, supra,* 271 Or at 594-95. Unless the plan was so indefinite as to be illusory, its terms were binding on Columbia.

■■ Under the Columbia plan, the amount of the bonus pool could be determined by arithmetical calculation; the amount in the December, 1981, pool is not disputed. The allocation of the pool to individual employes was, under the plan as it functioned in practice, the responsibility of Inskeep and Rippey as the Executive Committee of the Board. The plan did not establish a precise formula by which they allocated the pool but left the allocation to their discretion. However, that discretion was not unlimited: it had to be exercised "in good faith," "so as to attain the purposes of this plan." The plan thus was not discretionary in the sense that it provided Inskeep and Rippey a standardless discretion to do

whatever they wished. It was discretionary only in the sense that they could fix the precise amounts each employe would receive within the guidelines the plan set out. Each eligible employe (and under the plan officers are automatically eligible) had a contractual right to the company's good faith determination of the employe's appropriate share of the pool. That determination must be based on what, *from the employe's standpoint*,[5] will ensure that the employe will continue to provide the "extraordinary effort and abilities" that the plan is intended to evoke and will recognize the effort and ability the employe has already given.[6] The question, then, is whether there was evidence from which the jury could determine that Inskeep and Rippey, acting for Columbia, breached the company's obligation to allocate the bonus pool in good faith and in accordance with the plan's purposes by failing to give plaintiff any bonus at all.[7]

■   The jury could have found that, throughout 1981, plaintiff's work continued to be of its previous high quality and that plaintiff intended to continue working for Columbia indefinitely. It could also have found that Inskeep and Rippey fired plaintiff because of his resistance to their attempt to modify the buy-sell agreement to their advantage. It could have found further that Inskeep and Rippey excluded plaintiff from the final bonus distribution, not on the basis of their

---

[5] The bonus plan promised an employe a reward for good service. The employe complied with its terms by providing that service and being willing to remain with Columbia. Columbia could not deprive the employe of the promised reward by terminating the employment without just cause, at least in the absence of a clear statement in the bonus plan of the right to do so. *See Thompson v. Burr, supra*, 260 Or at 333-35.

[6] The bonus plan does not require that the employe continue to be employed at any particular date. This case is therefore unlike *Walker v. American Optical Corp.*, 265 Or 327, 509 P2d 439 (1973), in which the bonus plan required the employe to continue to be employed on April 1 and the employe voluntarily quit before that date. Plaintiff fulfilled his obligations under the plan, whether it is considered to be a bilateral contract subject to a condition precedent or an offer of a unilateral contract which became nonrevocable by plaintiff's performance. *See State ex rel Roberts v. Public Finance Co.*, 294 Or 713, 720 n 3, 662 P2d 330 (1983) (Roberts, J., dissenting).

[7] Defendants argue that the good faith language was inserted only to ensure that the IRS would treat the bonus distributions as employe compensation, rather than as shareholder dividends. The language thus cannot, they argue, be a standard—much less a sufficiently definite one—creating a binding contract. Defendants miss the point: Assuming an otherwise binding contract, the standard of good faith would exist in any event. Every contract includes an implied obligation of good faith performance. *See Perkins v. Standard Oil Co.*, 235 Or 7, 383 P2d 107, 383 P2d 1002 (1963).

evaluation of his importance to or performance on behalf of the company, but because of his resistence to their actions. Thus, the jury could have found that plaintiff complied with all the terms of the bonus plan but that Inskeep and Rippey, acting on behalf of Columbia, breached their obligation to include him in their good faith distribution of the pool.[8]

■     Once the jury found that Columbia breached its good faith obligation in the distribution of the bonus pool, it had to determine plaintiff's damages. This is the most difficult part of the case, for a good faith determination necessarily includes a significant subjective element. If this were the first bonus under the plan, plaintiff's damages might be so indefinite and speculative that the jury would have no basis for determining them. Or had plaintiff received a smaller bonus than usual, it might be impossible for the jury to find that Columbia had breached its good faith obligation by giving that smaller bonus. However, Columbia failed to give any bonus. Thus, the question for the jury was not whether a smaller than usual bonus was appropriate under the circumstances but whether Columbia's failure to give any bonus at all was in good faith. Once it had determined that that failure was not in good faith, the plan, both in its language and in its previous operation, provided adequate guidelines for the jury to determine plaintiff's damages.

During the years plaintiff received bonuses under the plan, his bonus was between 9.4 percent and 12.2 percent of the total pool. The bonus pool in question was $639,871. If plaintiff received his previous proportion of the pool, his bonus would have been between $60,148 and $78,064. Plaintiff's bonus was normally close to that of defendant Albert Corrado, who received $77,383 from this pool. Each of the two previous 1981 pools was smaller than the December pool. Plaintiff had received $50,000 from each of those pools. This information provided the jury with an adequate foundation for determining how Inskeep and Rippey allocated plaintiff's bonuses in the past and, thus, how, if they had acted in good

---

[8] Although there is evidence from which it could have done so, it was not necessary that the jury find that Inskeep and Rippey acted in bad faith. The obligation to act in good faith is an affirmative one; it is breached by a failure to act at all as well as by actions which are actually taken in bad faith. Here, Inskeep and Rippey breached the agreement as to plaintiff if their failure to include him was not based on a good faith determination that his exclusion met the purposes of the plan.

faith, they would have allocated this bonus. The jury apparently decided that the best measure of plaintiff's damages was what he had received from each of the previous 1981 pools, which was the lowest of the likely figures. It is supported by the evidence and is within the prayer of plaintiff's complaint. The court should have entered judgment on the verdict; it erred in granting the judgment n.o.v.[9] We turn now to plaintiff's other claims.

■ The court granted defendants' motion for partial summary judgment on plaintiff's allegations seeking penalty wages under ORS 652.150[10] and attorney fees under ORS 652.200(2),[11] on the ground that plaintiff was not an employe protected by those statutes. It relied on *Lamy v. Jack Jarvis & Company, Inc.,* 281 Or 307, 574 P2d 1107 (1978), in which the Supreme Court held that a 30 percent shareholder who quit his job but stayed on two days after his termination date to complete a project was acting as a partner rather than as an

---

[9] The parties cite a number of bonus cases from other jurisdictions. We have considered them to the extent that they are consistent with Oregon law. However, the wide variety of bonus plans described in the cases, together with the general failure of the cases to consider the importance of the good faith obligation of the employer, makes them of only marginal value to our decision in this case. The only case cited which considers the interplay of a discretionary decision with the obligation to perform in good faith is *American Automatic Sprinkler Corp. v. Anderson,* 243 Ga 867, 257 SE2d 283 (1979). However, the employe in that case voluntarily terminated his employment. The plan provided that, under those circumstances, payment "will rest completely in the absolute and final discretion" of the company. 243 Ga at 867. That is the absolute and standardless discretion of a true illusory promise. It is not the limited discretion, measured by past practices and the purposes of the bonus plan, that Inskeep and Rippey had in this case.

[10] ORS 652.150 provides:

"If an employer wilfully fails to pay any wages or compensation of any employe who is discharged or who quits his employment, as provided in ORS 652.140, then, as a penalty for such nonpayment, the wages or compensation of such employe shall continue from the due date thereof at the same rate until paid or until action therefore is commenced; provided, that in no case shall such wages or compensation continue for more than 30 days; and provided further, the employer may avoid liability for the penalty by showing his financial inability to pay the wages or compensation at the time they accrued."

[11] ORS 652.200(2) provides:

"In any action for the collection of wages, if it is shown that the wages were not paid for a period of 48 hours, excluding Saturdays, Sundays and holidays, after the same became due and payable, the court shall upon entering judgment for the plaintiff, include in such judgment, in addition to the costs and disbursements otherwise prescribed by statute, a reasonable sum for attorney fees at trial and on appeal for prosecuting said action, unless it appears that the employe has wilfully violated the contract of employment."

employe for those two days. In deciding the case, the court adopted the distinction between employes and co-partners which is found in ORS 652.210(2) (the Equal Pay Act) and ORS 652.310(2) (the Wage Collection Act).

Defendants assert that *Lamy* establishes a general rule that a major stockholder and high corporate officer is not an employe for the purposes of penalty wages or attorney fees. In making this argument, defendants ignore the basis of the Supreme Court's holding in *Lamy,* which is that the plaintiff had ceased to be an employe and, *for the two days in question,* was working as a partner. The court apparently would have reached a different conclusion if the plaintiff had sought compensation for work performed before he terminated his status as an employe.

■　A corporate officer working for the corporation on a salary is a corporate employe. A corporate shareholder who is employed by the corporation is a corporate employe. The two statuses of shareholder and employe are distinct. *See Campbell v. Ford Industries, Inc.,* 274 Or 243, 546 P2d 141 (1974) (the plaintiff failed to state a claim for wrongful discharge because, in seeking access to corporate information, he was acting as a stockholder rather than as an employe). The very heart of corporation law is that the corporation is an entity separate and distinct from its owners. We see nothing in ORS 652.150 or ORS 652.200(2) which changes those normal rules. Although plaintiff was a stockholder, his compensation came to him an employe; Columbia has never paid dividends. Plaintiff was a Columbia employe, and Columbia failed to pay him part of his earned compensation.[12] The matter is remanded to the trial court for determination of a reasonable attorney fee and such other proceedings as may be appropriate.[13]

---

[12] The Supreme Court has held that an employe is entitled to attorney fees under ORS 652.200(2) in an action to recover unpaid commissions. *Hekker v. Sabre Construction Co.,* 265 Or 552, 560, 510 P2d 347 (1973). Under the broad construction given "wages" in *Hekker,* an employer's failure to pay a bonus also entitles the employe to attorney fees.

[13] Concerning a wilfull failure to pay compensation, *see Sabin v. Willamette-Western Corp.,* 276 Or 1083, 1093, 557 P2d 1344 (1976); *Putnam v. Department of Justice,* 58 Or App 111, 115-16, 647 P2d 949 (1982); *Schulstad v. Hudson Oil Company, Inc.,* 55 Or App 323, 328-29, 637 P2d 1334, *rev den* 292 Or 825 (1982); concerning computation of penalty wages, *see State ex rel Nilsen v. Adams,* 248 Or

■ Plaintiff asserts, finally, that the court erred by entering a judgment which purported to dismiss by stipulation certain claims which plaintiff had previously voluntarily withdrawn. Plaintiff is concerned that the judgment might be treated as a dismissal with prejudice and might thereby bar his later assertion of those claims. Defendants respond that, under current *res judicata* principles, those claims are barred whether or not the dismissal is with prejudice. This is the first case in which plaintiff has brought these claims, and this is the first time they have been formally dismissed. Whether the dismissal is by plaintiff's notice of dismissal or by stipulation of the parties, it is without prejudice to a later action on the same claims. ORCP 54A(1). The *res judicata* effect of plaintiff's dividing his claims between two cases can be decided when and if plaintiff brings a new case.

■ ■ On cross-appeal, defendants argue that the court's award to them of $10,000 in attorney fees on plaintiff's claim for specific performance of the buy-sell agreement is too low, because the only evidence presented was that a reasonable fee was $30,000. The court awarded a lower fee than that requested because it believed that the time defendants' counsel spent on the issues which were subject to a fee award was excessive. The judge sat through the trial, knew how long it took and was in a position to determine the complexity of the issues and, thus, the amount of time reasonably necessary for preparation. He did not have to accept the testimony of an expert who only evaluated the file after the trial. A judge may use his independent observations in evaluating the evidence in support of a fee petition. This judge did so and, although we might have awarded a different amount, we cannot say as a matter of law that his ultimate determination was improper. *See Slocum v. Harder,* 275 Or 725, 729, 553 P2d 349 (1976).

Reversed and remanded with instructions to enter judgment for plaintiff on the verdict and to award attorney fees and for further proceedings on the penalty wage claim; affirmed on cross-appeal.

269, 279, 431 P2d 270, 433 P2d 831 (1967); *Nordling v. Johnston,* 205 Or 315, 335-37, 283 P2d 994, 287 P2d 420 (1955).