Argued and submitted September 30, 1985, affirmed in part, reversed in part, and remanded February 26, Lonnie Best's reconsideration and U. S. National's reconsideration denied April 17, both petitions for review allowed May 20, 1986 (301 Or 165)

BEST et al,
*Appellants - Cross-Respondents,*

*v.*

UNITED STATES NATIONAL BANK OF OREGON,
*Respondent - Cross-Appellant.*

(A7905-02523; CA A32299)

714 P2d 1049

Phil Goldsmith, Portland, argued the cause for appellants - cross-respondents. With him on the briefs were Henry A. Carey and John D. Ryan, Portland.

James N. Westwood, Portland, argued the cause for respondent - cross-appellant. With him on the brief were Clifford N. Carlsen, Jr., R. Alan Wight, and Miller, Nash, Wiener, Hager & Carlsen, Portland.

Before Richardson, Presiding Judge, and Warden and Rossman, Judges.

RICHARDSON, P. J.

## RICHARDSON, P. J.

This is a class action challenging the validity of defendant bank's service charge for processing checks drawn against nonsufficient funds (NSF charge). Plaintiffs brought this action on behalf of themselves and other persons similarly situated. They alleged six claims for relief. On their second (breach of good faith) and fourth (penalty) claims, the trial court certified a class comprised of natural persons who were Oregon residents, had nonbusiness checking accounts with the bank between May 31, 1973, and May 30, 1979, and had paid NSF charges during that period. On their third claim (unconscionability), it certified a subclass consisting of class members who had opened their checking accounts on or after July 1, 1968. The other three claims were peculiar to the named plaintiffs. Only the claims of the class and the subclass are involved in this appeal. Those claims are: (1) the NSF charges were an unlawful penalty for breach of contract; (2) the charges were unconscionable; and (3) the bank breached its implied covenant of good faith by setting the charges at unreasonably high amounts. Plaintiffs sought relief totalling $30 million on those claims. The trial court granted the bank's motion for summary judgment against those claims.[1] Plaintiffs appeal and the bank cross-appeals. We affirm in part and reverse in part.

Our scope of review is to determine whether there are any genuine issues of material fact and whether the bank is entitled to judgment as a matter of law. ORCP 47C. We review the record in the light most favorable to the party opposing the motion, *Uihlein v. Albertson's, Inc.,* 282 Or 631, 634, 580 P2d 1014 (1978), including those issues on which the party opposing the motion would have the burden of proof at trial. *Seeborg v. General Motors Corporation,* 284 Or 695, 699, 588 P2d 1100 (1978).

■ An initial issue is whether various federal statutes and agency regulations preempt state regulation of bank charges and therefore defeat plaintiffs' claims. Plaintiffs contend that the bank did not properly raise that defense in the

---

[1] The final judgment complies with ORCP 67B.

trial court.[2] We will assume for the sake of argument that it did. The bank asserts essentially the identical preemption argument rejected in *Perdue v. Crocker Nat. Bank,* 38 Cal 3d 913, 932-44, 216 Cal Rptr 345, 702 P2d 503 (1985), another class action challenging the validity of NSF charges. *Perdue* contains a thorough, well-reasoned analysis of the preemption issue, and we agree with it. In contrast, *Jacobs v. Citibank, N.A.,* 61 NY2d 869, 474 NYS2d 464, 462 NE2d 1182 (1984), on which the bank relies, contains only two sentences concerning preemption, and we decline to follow it on that issue. Assuming that the issue is properly before us, federal law does not preempt plaintiffs' claims.

The common gravamen of plaintiffs' claims is that the bank's NSF charges were unreasonably high. Plaintiffs introduced evidence, for example, that in 1979, although the bank's cost of processing an NSF check was $1.08, its charge was $5.00.

Plaintiffs' "penalty" claim was based on the theory that they breached their deposit agreement with the bank when they wrote NSF checks and that the NSF charges constituted unreasonably high liquidated damages for that breach and hence were void as a penalty. *See Illingworth v. Bushong,* 297 Or 675, 688 P2d 379 (1984). They contend that the deposit agreement in question contains an express or implied promise not to write NSF checks and, although the bank would be entitled to damages for that breach, the NSF charges were far in excess of the anticipated cost for processing such checks. The bank responds that the deposit agreement neither expressly nor impliedly prohibits the writing of NSF checks. It argues that it processes NSF checks as a service for depositors and that the NSF charge is merely a service charge for the processing of such checks. The trial court agreed with the bank.

To establish that the NSF charge was an unlawful

---

[2] The trial court issued a judgment on February 15, 1984. Defendant had moved earlier to file an amended answer raising a defense of federal regulatory preemption. The motion was denied but, on reconsideration, the court granted the motion and entered another judgment incorporating a ruling on defendant's preemption defense. Plaintiff filed a notice of appeal from both judgments and defendant filed a notice of cross-appeal from the first judgment. Because of our disposition of the preemption argument, we do not address the cross-appeal.

penalty for breach of contract, plaintiffs first must establish that writing an NSF check was a breach of their deposit agreement. The deposit agreement appeared on the signature card plaintiffs signed when they opened their accounts. It provided, as pertinent:

"1. All transactions are governed by contract as printed on Bank's deposit slips and other forms * * *.

"2. This account is subject to Bank service charges existing at any time. * * *

"* * * * *

"4. It is agreed that all transactions between said Bank and the signers shall be governed by contract as printed on this signature card, deposit slips and other forms: that said account is subject to Bank's service charges in effect at any time * * *."[3]

The agreement does not expressly prohibit the writing of NSF checks, nor does it specifically mention NSF checks. Plaintiffs, however, rely on the following grab bag of facts from which they argue that an implied promise not to write NSF checks should be read into the deposit agreement: (1) the deposit agreement did not explicitly permit them to write NSF checks; (2) the cost of processing an NSF check greatly exceeded the cost of writing a check against sufficient funds; (3) the bank discouraged the writing of NSF checks; (4) plaintiffs' accounts were subject to being closed for the writing of NSF checks; (5) a bank officer in a memorandum concerning the closing of unsatisfactory accounts referred to a hypothetical depositor who wrote many NSF checks as having engaged in "blatant contractual violations"; (6) another bank officer referred to persons who regularly wrote NSF checks as "habitual offenders"; (7) if customers asked whether they were permitted to write NSF checks, they were told that they were not; (8) a relatively small number of the bank's customers actually wrote NSF checks; (9) the bank referred to the NSF charge as a "penalty charge"; and (10) one of the bank's advertisements suggested that "innocent" persons could avoid

---

[3] Plaintiffs have not drawn our attention to any of the bank's "deposit slips and other forms" mentioned in the deposit agreement, if indeed there are any in the voluminous record. We therefore assume that plaintiffs base their case entirely on the terms on the face of the deposit agreement and not on the terms of those "deposit slips and other forms."

writing NSF checks if they participated in the bank's automatic cash transfer program.

The appellate courts of California and New York have confronted the so-called "penalty theory" in class actions challenging the validity of NSF charges. In none of those cases were the plaintiffs able to establish an implied promise not to write NSF checks.

In three cases from California that illustrate the reasoning, the plaintiff alleged that the banks' NSF charges constituted unlawful liquidated damages in violation of a state statute. In *Hoffman v. Security Pacific Nat. Bank,* 121 Cal App 3d 964, 176 Cal Rptr 14 (1981), the court upheld a directed verdict in favor of the bank. It held that plaintiff failed to prove that the writing of an NSF check was a breach of their deposit agreement:

> "Plaintiff argued, and attempted to prove, that the depositors entered into a covenant not to write NSF checks when they executed signature cards which contained the statement: 'This account shall be governed by applicable banking laws, customs, and Clearing House regulations and by the rules presented in the bank book, and shall be subject to the service charge schedule of the bank.' Plaintiff attempted to show that industry custom prohibited the writing of overdrafts without prior agreement and that the depositors' promise to pay a service charge for any NSF check contained an implied covenant not to write such checks.

> "Plaintiff failed to establish any such custom or any agreement on the depositors' part not to write overdrafts. Moreover, statutes governing the obligations of banks and their depositors, which are incorporated into and become part of the contract between a bank and its depositors * * *, treat an overdraft as an application for advance credit rather than as a breach of an express or implied covenant. California Uniform Commercial Code section 4401[4] specifically author-

---

[4]Cal. Commercial Code § 4401(1) (West 1964) provides:

"As against its customer, a bank may charge against his account any item which is otherwise properly payable from that account even though the charge creates an overdraft and in such event recover or obtain a refund of the amount of overdraft."

ORS 74.4010(1) (Uniform Commercial Code § 4-401(1)) is in substance identical to that provision, except that it does not expressly provide that the bank may recover or obtain a refund of the amount of the overdraft.

izes a bank to pay overdrafts and to charge customers' accounts to recover amounts paid, even when payments result in overdrafts on the account. While a bank has a statutory obligation to honor any check drawn by a depositor for an amount not exceeding the balance in his account, and while the depositor has a contractual obligation to pay a service charge when he presents a NSF check, the depositor has no statutory or contractual obligation to refrain from drawing checks for amounts in excess of the balance in his account. (Cal. U. Com. Code, § 4401.) In brief, plaintiff did not and could not prove that the depositors breached an obligation to Bank when they negotiated NSF checks. Accordingly, the service charge they agreed in advance to pay for presenting such an overdraft was not a penalty under former Civil Code section 1670." 121 Cal App 3d at 968-69. (Citations omitted.)

In *Shapiro v. United California Bank,* 133 Cal App 3d 256, 184 Cal Rptr 34 (1982), the court also upheld a directed verdict in favor of the bank. At trial, the plaintiffs had introduced the testimony of a banking expert to prove that their deposit agreement with the bank included an implied promise not to write NSF checks.[5] They also attempted to prove that custom and usage in the banking industry prohibited the writing of NSF checks and that, consequently, a promise not to write such checks should be implied as a term of their deposit agreement. The court held that the expert's testimony was insufficient to establish an implied promise not to write NSF checks:

"While [the expert's] testimony may have been sufficient to establish that [the bank] considered it an obligation of plaintiffs not to write NSF checks, it was not sufficient to establish *plaintiffs'* implied promise not to write NSF checks. Plaintiffs' express promise to pay 'any and all service charges now or hereafter established' does not necessarily carry with it an implied promise to refrain from writing NSF checks. Since plaintiff did not introduce evidence sufficient to satisfy the requirements of *Cousins [Inv. Co. v. Hastings Clothing Co.,* 45 Cal App 2d 141, 113 P2d 878 (1941) (a case concerning implied promises)], no covenant may be implied into the

---

[5] The deposit agreement in *Shapiro* provided, in pertinent part:

"* * * '[T]his account shall be carried as a _____ REGULAR _____ SPECIAL checking account, and shall be governed by the bylaws, rules, regulations and practices of the Bank in force from time to time, and shall be subject to any and all service charges now or hereafter established.' " 133 Cal App 3d at 259, n 4.

signature card agreement binding plaintiffs to refrain from writing NSF checks." 133 Cal App 3d at 262. (Emphasis in original.)

Relying on *Hoffman,* the court also concluded that the plaintiffs had failed to prove any industry custom which required the inclusion of the implied promise in the deposit agreement.

The California Supreme Court recently addressed the penalty theory in *Perdue v. Crocker Nat. Bank, supra.* The court upheld an order allowing a demurrer in favor of the bank against the plaintiffs' penalty claim. The deposit agreement in *Perdue* provided that the depositors " 'agree with [the bank] and with each other that . . . this account and all deposits therein shall be . . . subject to all applicable laws, to the Bank's present and future rules, regulations, practices and charges, and to its right of setoff for the obligations of any of us.' " 38 Cal 3d at 921. The court held that the agreement did not contain an implied promise not to write NSF checks, but its reasoning differed from the Court of Appeal in *Hoffman* and *Shapiro*:

> "We cannot entirely agree with *Hoffman* and *Shapiro* that the contract between the bank and the depositor treats an overdraft as an application for advance credit. The contract in fact is silent on the characterization of an NSF check, and the bank is aware that a depositor often writes overdrafts in the mistaken belief that he has, or will have, sufficient funds to cover the check, and without any intent to apply for credit. We agree with those decisions, however, that because the depositor has never agreed to refrain from writing NSF checks, the writing of such a check is not a breach of contract. The fee that the bank may charge for processing such a check is limited by principles of good faith, reasonableness, unconscionability, and the like, but it is not limited to the amount which a bank could recover in a suit for breach of contract. * * *" 38 Cal 3d at 933. (Footnote omitted.)

*Jacobs v. Citibank, N.A., supra,* is indicative of the New York appellate analysis. There the court upheld a summary judgment in favor of the bank and rejected the plaintiffs' argument that the bank's NSF charge was a penalty prohibited by Uniform Commercial Code § 1-106(1):[6]

---

[6] Uniform Commercial Code § 1-106(1) is in substance identical to ORS

"* * * Inasmuch as there is no statutory or common-law duty imposed upon a banking customer to avoid writing or depositing overdraft checks—indeed the use of overdrafts is expressly contemplated by and provided for in subdivision (1) of section 4-401 of the Uniform Commercial Code, as well as the agreements between the parties—the use of such checks cannot be properly characterized as a breach. There being no breach committed by plaintiffs, it cannot be said that the fees imposed constitute 'penal damages' within the purview of subdivision 1 of section 1-106 of the Uniform Commercial Code." 61 NY2d at 872.

Returning to this case, an implied promise in a written contract can arise only when the written terms of the contract reveal that the promise was within the contemplation of the parties when they made the contract or when it is necessary to carry the parties' intention into effect. *Card v. Stirnweis,* 232 Or 123, 134-35, 374 P2d 472 (1962). The facts on which plaintiffs rely are not sufficient to establish an implied promise not to write NSF checks. Indeed, plaintiffs' evidence is weaker than that found insufficient to establish such a promise in *Shapiro v. United California Bank, supra.* Plaintiffs' agreement that their accounts would be subject to the bank's service charges does not necessarily include a promise not to write NSF checks. A more reasonable interpretation of the agreement between the parties is that, although the bank discouraged the writing of NSF checks and its customers normally did not intend to write such checks, the writing of NSF checks was not a breach of the deposit agreement. Instead, it was an event contemplated by the parties. The bank knew that its customers would either intentionally or inadvertently write NSF checks, and it therefore provided the service of processing those checks for a fee. Bank customers are generally aware that they will be required to pay a fee if they write NSF checks, and the NSF charge, rather than being a penalty for breach of contract, is simply a fee for processing NSF checks. The deposit agreement in question did not contain an implied promise not to write NSF

---

71.1060(1), which provides:

"The remedies provided by the Uniform Commercial Code shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed but neither consequential or special nor penal damages may be had except as specifically provided in the Uniform Commercial Code or by other rule of law."

checks. There is no genuine issue of material fact, and the bank is entitled to judgment on this claim as a matter of law.

We next consider plaintiffs' unconscionability claim. They allege that the NSF charge was unconscionable, because it greatly exceeded the bank's cost of processing NSF checks. They sought restitution of the NSF charges they had paid. The trial court ruled that, under *Rosboro Lumber Co. v. EBI,* 65 Or App 679, 672 P2d 1336 (1983), *rev'd on other grounds,* 297 Or 81, 680 P2d 386 (1984), the doctrine of unconscionability is not a basis for affirmative relief.

■      Plaintiffs cite Uniform Commercial Code § 2-302 (ORS 72.3020) and Restatement (Second) Contracts, § 208 (1979), as the bases of their claim.[7] They contend that the result will be the same whether their claim is analyzed under the UCC or the Restatement. Whether or not that is true, UCC § 2-302 does not apply in this case, because UCC Article 2 is limited to transactions in goods. UCC § 2-102 (ORS 72.1020). However, because the Restatement follows UCC § 2-302, *see* Reporter's Note to § 208, and UCC § 2-302 has been influential in nonsales cases, *see* Comment *a* to § 208, cases decided under that section are helpful in analyzing plaintiffs' claim.

■      In *Rosboro Lumber,* the plaintiff sought restitution of workers' compensation insurance premiums it had paid to the defendant, on the basis, *inter alia,* that the defendant had engaged in unconscionable conduct. We analyzed that claim

---

[7] ORS 72.3020 provides:

"(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

"(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination."

Restatement (Second) Contracts, § 208 (1979), provides:

"If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result."

under the Restatement and held that, "although unconscionability may be a defense to the enforceability of a contract, it is not a basis for affirmative relief." We affirmed the dismissal of the plaintiff's unconscionablility claim.[8] 65 Or App at 682.

*Rosboro Lumber* is clearly on point and adverse to plaintiffs' claim. They offer a number of suggestions to avoid its holding. First, they point out that the emphasized portion of the following passage from Dobbs on Remedies 707 (West Ed 1973), which we quoted in *Rosboro Lumber,* 65 Or App at 682, supports their claim for restitution:

> "* * * [T]he remedy [for unconscionability] remains essentially defensive, for the plaintiff does not recover damages; he will only be relieved of the contractual obligation, *or, possibly, if he has already paid an unconscionable sum, will be allowed restitution to the limits of conscionability."* (Emphasis supplied.)

Dobbs, however, cites no authority for that assertion and, as discussed below, we have found none. Furthermore, the *holding* of *Rosboro Lumber* is that the doctrine of unconscionability is not a basis for restitution.

Second, plaintiffs cite *Zemp v. Rowland,* 31 Or App 1105, 572 P2d 637 (1977), *rev den* 282 Or 537 (1978), for the proposition that unconscionability is a basis for restitution. There, the plaintiffs brought an action against their landlord to recover a nonrefundable fee that they had paid under a provision of their lease. They alleged that the provision was unconscionable under the Oregon Residential Landlord and Tenant Act. We held that the provision was not unconscionable. We did not hold that restitution would have been available had we found the provision unconscionable. *Zemp* is inapposite.

---

[8] The trial court in *Rosboro Lumber* had dismissed all four of the plaintiff's claims. We upheld the dismissal of two of those claims, including the unconscionability claim, and reversed and remanded as to the other two. The Supreme Court reversed and remanded for reinstatement of the original trial court judgment. *Rosboro Lumber Co. v. EBI,* 297 Or 81, 680 P2d 386 (1984). The court's decision is a memorandum decision and does not state its reasons. Although it is impossible to state why the court reversed our decision, it is safe to state that it did not reverse on the unconscionability issue, because both this court and the Supreme Court upheld the dismissal of the unconscionability claim.

Finally, plaintiffs urge us to overrule *Rosboro Lumber*. We decline to do that. We have found no authority anywhere that the doctrine of unconscionability is a basis for restitutionary relief. In *W.L. May Co. v. Philco-Ford Corp.*, 273 Or 701, 707, 543 P2d 283 (1975), decided under UCC § 2-302, the court noted that "[n]ormally, the doctrine [of unconscionability] is asserted as an affirmative defense, and it does not appear that it was originally intended as a basis for damage recovery." However, the court expressly left unanswered the question of whether UCC § 2-302 could be used offensively. 273 Or at 709, n 2. Cases from other jurisdictions uniformly hold that UCC § 2-302 is not a basis for an award of damages. *Cowin Equipment Co., Inc. v. General Motors Corp.*, 734 F2d 1581 (11th Cir 1984); *Whitman v. Connecticut Bank and Trust Company*, 400 F Supp 1341, 1346 (D Conn 1975); *Vom Lehn v. Astor Art Galleries, Ltd.*, 86 Misc 2d 1, 380 NYS2d 532, 541 (1976); *Pearson v. National Budgeting Systems, Inc.*, 31 AD2d 792, 297 NYS2d 59 (1969); *Witmer v. Exxon Corp.*, 260 Pa Super 537, 394 A2d 1276 (1978), *aff'd* 495 Pa 540, 434 A2d 1222 (1981); *see also* 2 Anderson, Uniform Commercial Code 409, § 2-302:24 (2d ed 1970).

■     At least one other court has specifically denied restitution in a non-UCC case. In *Bennett v. Behring Corp.*, 466 F Supp 689 (SD Fla 1979), *appeal dismissed* 629 F2d 393 (5th Cir 1980), property owners brought an action against a developer and others alleging, *inter alia,* that a provision in their deeds requiring them to lease certain recreational facilities was unconscionable. They sought the return of the amounts they had paid under that provision. The court held that the provision was not unconscionable, but it also stated that unconscionability is not a basis for affirmative relief:

> "Plaintiffs [*sic*] attempt to obtain a judgment for money damages for sums previously collected by [the defendant] under the recreation leases must fail in any event, regardless of a finding of unconscionability. While plaintiffs may be able to recover monetary damages for fraud and/or intentional misrepresentations, as alleged in Counts I and VI, the equitable theory of unconscionability has never been utilized to allow for the affirmative recovery of money damages. * * *

> "The Court finds that neither the common law of Florida, nor that of any other state, empowers a court addressing allegations of unconscionability to do more than refuse

*enforcement* of the unconscionable section or sections of the contract so as to avoid an unconscionable result. * * *" 466 F Supp at 700. (Emphasis in original; citations omitted.)

Because the doctrine of unconscionability is not a basis for affirmative relief, the trial court was correct in granting the bank's motion for summary judgment against the unconscionability claim.

Finally, we address plaintiffs' good faith claim. They allege that the bank breached its implied obligation of good faith in using its authority to set the NSF charge by setting the amount of the charge greatly in excess of the costs of processing NSF checks. The trial court evidently ruled that the doctrine of good faith, like the doctrine of unconscionability, is not a basis for affirmative relief.

Every contract contains an implied covenant of good faith and fair dealing. *Comini v. Union Oil Co.,* 277 Or 753, 756, 562 P2d 175 (1977); *Perkins v. Standard Oil Co.,* 235 Or 7, 16, 383 P2d 107, 383 P2d 1002 (1963); *Wyss v. Inskeep,* 73 Or App 661, 668, n 7, 699 P2d 1161, *rev den* 300 Or 64 (1985). When that covenant is breached, the nonbreaching party may bring an action for breach of contract. *See Perkins v. Standard Oil Co., supra.* The trial court erred in ruling that plaintiffs had no basis for relief on their good faith claim.

Whether a party has breached the covenant of good faith and fair dealing is a question of fact. *See Wyss v. Inskeep, supra.* Under the deposit agreement in question the bank had the power to set its NSF charges. That power was not unlimited; the bank was required to exercise it in good faith. Plaintiffs introduced evidence that the bank's NSF charges greatly exceeded its costs of processing NSF checks and that the profit derived from NSF check fees exceeded its normal profit margin. That evidence raises a genuine issue of material fact as to whether the bank breached its implied obligation of good faith by setting its NSF charges at unreasonably high rates. The trial court erred in granting the bank's motion for summary judgment on plaintiffs' good faith claim.[9]

---

[9] Given our resolution of this case, we need not address plaintiffs' second and third assignments of error.

Judgment on second claim for relief reversed and remanded; otherwise affirmed.