Argued June 5, reversed August 7, petition for
rehearing denied September 3, 1975

LANDURA CORPORATION, *Respondent, v.*
SCHROEDER ET UX, *Appellants.*

539 P2d 150

*Henry L. Bauer,* Portland, argued the cause for appellants. With him on the briefs were P. L. Peterson and Bauer, Murphy, Bayless & Fundingsland, Portland.

*Robert L. Engle,* of Eichsteadt, Boland & Engle, Woodburn, argued the cause and filed the brief for respondent.

Before O'CONNELL, Chief Justice, and DENECKE, HOLMAN, TONGUE, HOWELL and BRYSON, Justices.

TONGUE, J.

This is a suit for specific performance of a contract for the sale of land. After the sustaining of a demurrer by defendants (the sellers), on the ground that the contract was not sufficiently definite for specific performance, particularly in its terms relating to contract payments, mortgage security and partial acreage release, plaintiff (the purchaser), filed an amended complaint seeking specific performance of the agreement as a cash sale, pursuant to a contract provision permitting it to pay off the contract balance in cash at any time. Defendants appeal from a de-

cree granting specific performance on the condition that the contract balance of $100,000 be paid within 45 days.

*The facts.*

Defendants are the owners of 19 acres of land in Woodburn, on which they reside. They are elderly people and neither have received formal education beyond the eighth grade. Mr. Schroeder, however, had engaged in previous real estate transactions.

On September 26, 1973, they were approached by Roger Midura, a builder and a "co-owner" of plaintiff, a California corporation, with an offer to purchase the property. After three or four visits to defendants' home, an agreement was reached on a sale price of $105,000. Based upon his discussions with defendants, Mr. Midura then typed a proposed contract of sale, including, among other things, a provision for payments over a term of 10 years, with interest at 7.25 per cent, "in order to assure the SELLER a guaranteed cash flow with minimal taxation on long-term capital gains." The contract as proposed by Mr. Midura, however, also included a provision that "the PURCHASER can pay off any and/or all notes and/or mortgages * * * at any time, with no pre-payment penalties * * *."

That agreement was then submitted by Mr. Midura to defendants at their home and was read to them by him at that time and they also read it at that time, according to his testimony. According to defendants, however, Mr. Midura read it rapidly and they did not read it. The agreement was then signed by Mrs. Schroeder before leaving for work, but after some discussion of her desire to keep certain items, which was agreeable to Mr. Midura.

He and Mr. Schroeder then went to a bank where they discussed the agreement with one of its officers,

who suggested that an attorney be engaged to prepare the necessary escrow papers. Mr. Schroeder, however, objected to engaging an attorney.

While at the bank five "amendments" were added to the agreement below the signature of Mrs. Schroeder. These "amendments" not only included reference to the items which she desired to retain, but also provided, among other things, that as part of the down payment plaintiff would "assume the $10,583.33 assessment held by the City of Woodburn" and that the cash down payment would accordingly be reduced from $25,000 to $14,000; that the seller would pay all 1973-74 property taxes and give the purchaser one-fourth of the 1973-74 wheat crop.

Mr. Schroeder and Mr. Midura then signed the agreement in the spaces provided above these "amendments." According to the testimony, Mr. Schroeder was under the impression that this was the "final agreement" to be executed by him. Mr. Midura then delivered to Mr. Schroeder a check for $5,000, which was accepted, endorsed and deposited by him.

A few days later Mr. Schroeder, in a conversation with a friend or neighbor, seemed pleased with the sale and the sales price until informed that, in effect, he was "giving them the house" at the price per acre he was being paid for his land. Mr. Schroeder admitted that he then "changed [his] mind."

About two weeks after signing the contract, Mr. Midura "called" the defendants' home and Mrs. Schroeder informed him that defendants did not intend to proceed with the transaction. They subsequently refused to sign the more formal contract of sale as presented to them by plaintiff, which later made an offer to pay the entire purchase price in cash.

1. *The contract provision permitting cash payment was inconsistent with the provision for a "guaranteed cash flow" for 10 years.*

Among other contentions, defendants say that the contract, as prepared by plaintiff, is not properly subject to specific performance because of a fatal inconsistency in two of its important and material provisions. Thus, defendants contend that the provision of the contract, as prepared by Mr. Midura, under which plaintiff may pay off the entire contract at any time, "with no pre-payment penalties," is completely inconsistent with the provision under which defendants were to be paid "a guaranteed cash flow with minimal taxation on long-term capital gains" with payments to be made over a period of 10 years and with interest at 7.25 per cent, as intended and understood by them.[1]

In response, plaintiff contends that these provisions are not so inconsistent as to make the contract unenforceable by specific performance; that defendants "had no real preference as to the manner of payment," but "wanted their price"; that plaintiff "would have preferred long term payments," but "provided an alternative means of payment as is common in all contracts, giving the purchaser the option to prepay without penalty." Plaintiff also contends that:

> "The *intent* of the parties at the time of the execution of the contract must govern. Given the *intent*, clear and unequivocal by the testimony, the

---

[1] This contract provision is as follows:

"In order to assure the SELLER a guaranteed cash flow with minimal taxation on long-term capital gains, the PURCHASER shall make payments of interest only on the unpaid principal balance for the first ten years of the mortgage. After that, the PURCHASER shall pay the SELLER, or his estate, $10,000.00 principal per year plus accrued interest on the unpaid principal balance until all principal and interest has been paid in full. Interest shall accrue at 7.25% per year on the unpaid principal balance."

contract provisions of § 2 and § 4 are not so inconsistent as to deny specific performance." (Emphasis theirs)

and that:

"The trial judge had the opportunity to view and listen to the parties to determine their *real* intent. * * *" (Emphasis theirs)

Accordingly, plaintiff contends that even though the contract provisions for payments over a period of 10 years were not sufficiently definite for enforcement by specific performance, the trial court properly entered a decree granting specific performance of the contract as a cash sale under the authority of *Phillips v. Johnson,* 266 Or 544, 514 P2d 1337 (1973).

■ We agree that in determining whether contract provisions are inconsistent it is important to seek the intent of the parties.

In addition, as stated in *Loomis v. MacFarlane,* 50 Or 129, 134-35, 91 P 466 (1907) (quoting from another authority):

"* * * 'Where the true import and meaning of a written instrument is doubtful, and the intention of the parties cannot be determined from its language, the right doctrine is that it should be construed most strongly against the person using the doubtful language, * * *'."

■ Upon reviewing the record in this case as in a trial de novo on the appeal of a suit in equity, we find that it was intended by the parties at the time of the execution of this contract that defendants have a "guaranteed cash flow" over a period of 10 years, interest at 7.25 per cent and with "minimal taxation on long-term capital gains."

Mr. Midura himself testified as follows:

"Q (By Mr. Bauer:) You were aware of the Schroeders' desire to receive the payments for their

property over an extended period of time, were you not?

"A It was one of the things that they mentioned they would like to have in it, yes.

"Q They said that was important to them, didn't they?

"A It was not as important to Mr. Schroeder as a sale price.

"Q But nevertheless important?

"A Yeah, on its own relative merits, I would assume it was.

"Q And you drafted, yourself, Plaintiff's Exhibit number 1 to try to accomplish that goal or wish, that the Schroeders had, regarding receiving the payments over an extended period of time, isn't that right?

"A If you are talking about October 11 agreement, yes, that's correct.

"Q And this is your language, 'in order to assure the seller of a guaranteed cash flow, with minimal taxation on long term capital gains,—' etcetera, that is the language you used, isn't it?

"A Yes, sir.

"Q So that would spread out his income over a long period of time, isn't that right?

"A Yes sir, it would."

Mr. Midura also testified that he explained to defendants the contract provision that plaintiff would have an option to pay off the balance of the purchase price at any time, but did not know "whether they comprehended completely"; that defendants' "primary concern" was the sales price; and that he did not have an attorney prepare the contract because he "was afraid that that would jeopardize his signing the documents * * *."

It may be true that defendants' "primary concern" was the sales price. We believe, however, that both for tax purposes and other reasons the terms for payment were also important to defendants, as to most sellers of real property; that one of the important objectives which defendants intended to achieve by the terms of the contract was a "guaranteed cash flow" for 10 years, with minimal taxation, and with interest at 7.25 per cent, as provided by § 2 of the contract and that this was also understood by Mr. Midura. The accomplishment of that intended purpose would be defeated by the payment of the entire contract balance without penalty, as provided by § 4.

It follows, in our opinion, that these two important and material contract provisions were inconsistent, when viewed in relation to the intent of the parties, with the result that the contract is not properly subject to enforcement by specific performance.

■ As stated in *Smith v. Vehrs,* 194 Or 492, 499, 242 P2d 586 (1952):

> "It is a well-established rule of law in this state that equity will not decree specific performance unless the contract is definite, certain and complete. The court cannot make a contract for the parties, nor can it make clear that which is left in doubt and uncertainty. [Citing cases]"

2. *Phillips v. Johnson distinguished.*

■ It is suggested that because plaintiff's original complaint sought specific performance of the contract not as a cash sale, but as a contract for payments over a period of 10 years and because defendants objected by demurrer to such a performance of the contract, they should not be heard to subsequently object to performance of the contract as a cash sale, as decreed by the trial court and as held proper in *Phillips v. Johnson,* 266 Or 544, 514 P2d 1337 (1973).

The contract for the sale of the property involved in *Phillips,* however, did not involve inconsistent provisions for payment. As in this case, the provisions of that contract for payment over a period of time were so indefinite as not to be subject to enforcement by specific performance. That contract, however, included no provisions for "guaranteed cash flow" or other provisions by which the seller was assured that he would have "minimal taxation on long-term capital gains." On the contrary, that contract specifically provided that the balance due under the contract was payable *"on or before"* a specified date.

We held in *Phillips v. Johnson, supra,* at 557-60, that although the contract provisions permitting payments over a period of time were so indefinite as not to be subject to specific performance, the contract by its terms, conferred upon the purchaser the right to pay the entire balance in cash. On that basis, we held in *Phillips* that the contract was subject to specific performance as a cash sale. Cf. *Howard v. Thomas,* 270 Or 6, 526 P2d 552 (1974).

In this case, however, to subject defendants to the enforcement of this contract as a cash sale would require the specific performance of a contract with inconsistent provisions and would also enforce it in such a manner as to defeat one of the important intended purposes of the contract—a "guaranteed cash flow" for 10 years, with interest at 7.25 per cent and with "minimal taxation on long-term capital gains."

On the other hand, to subject defendants to specific performance of this contract as one for payment over a period of 10 years would require this court to "rewrite" the contract because of its incomplete and indefinite provisions for contract payments, mortgage security and partial acreage release. This the court cannot do for reasons stated in *Smith v. Vehrs, supra* at 499.

The fact that defendants opposed enforcement of these incomplete and indefinite provisions is not inconsistent with defendants' opposition to enforcement of the contract as a cash sale. Even if it was, that fact would not empower this court to enforce this contract by specific performance. Neither does the fact that defendants may have "changed their minds" after signing the contract as prepared by Mr. Midura.

For these reasons, the decree of the trial court is reversed.