Argued and submitted June 27, reversed and remanded December 28, 2005

## David Lee CAREY
and Tanya Maria Carey,
husband and wife,
*Appellants,*

*v.*

## LINCOLN LOAN CO.,
an Oregon corporation,
*Respondent.*

9706-04753; A117696

125 P3d 814

John M. Berman argued the cause for appellants. With him on the briefs was Damon J. Petticord.

Steven E. Benson argued the cause and filed the brief for respondent.

Before Landau, Presiding Judge, and Brewer, Chief Judge,* and Armstrong, Judge.

BREWER, C. J.

---

* Brewer, C. J., *vice* Richardson, S. J.

## BREWER, C. J.

Plaintiffs David Lee Carey (David) and Tanya Marie Carey (Tanya) brought this declaratory judgment action to challenge the enforceability of several provisions in a land sale contract by which they purchased a house from defendant. They alleged that the provisions together make it impossible for them to sell the house. The trial court originally ruled that the provisions violated statutes that apply to loan agreements and that a limitation on prepayment was an impermissible restraint on alienation. We reversed that decision and remanded for the trial court to decide plaintiffs' argument that the provisions are unconscionable. *Carey v. Lincoln Loan Co.*, 165 Or App 657, 998 P2d 724 (2000). On remand, the trial court ruled against plaintiffs, and they appeal. We reverse.

■ The first issue that we must resolve is defendant's challenge to our jurisdiction over this or any other case.[1] According to defendant, the only legitimate courts are those named in Article VII (Original), section 1, of the Oregon Constitution.[2] Because the legislature does not have the constitutional authority to create any additional court, including an intermediate court of appeals, defendant argues, this court has no legal existence. We first describe the facts that are relevant to defendant's arguments and then discuss those arguments. After explaining why we reject defendant's position, we will turn to the facts that are relevant to the merits of the appeal.[3]

---

[1] Defendant first raised this issue before filing its brief by a motion to dismiss the appeal. We denied the motion by an order. Defendant raised the issue again in its brief. Because the issue affects our jurisdiction, defendant was entitled to renew its arguments in its brief and at oral argument without leave of the court. ORAP 7.15(3).

[2] Those courts are the Supreme Court, circuit courts, county courts, municipal courts, and justices of the peace.

[3] Defendant has also moved to dismiss the appeal as moot. It notes that plaintiffs have dissolved their marriage and that Tanya has filed a Chapter 13 bankruptcy proceeding, through which she was able to avoid the provisions in dispute and obtain the ability to sell the house. As plaintiffs point out, however, a substantial part of the claims against Tanya in the bankruptcy arise from this litigation and would lose their validity if plaintiffs are successful. The parties dispute whether that would benefit Tanya, but it appears to be at least possible that it would. The case, therefore, is not moot. We do not need to decide at this point what other claims either plaintiff retains.

Article VII (Amended), section 1, of the Oregon Constitution (section 1), provides that the "judicial power of the state shall be vested in one supreme court and in such other courts as may from time to time be created by law." It thereby authorizes the legislature to create this and other courts inferior to the Supreme Court. However, before the adoption of Article VII (Amended) in 1910, Article VII (Original), section 1, vested the judicial power of the state in the courts that it specifically named, which did not include an intermediate court of appeals. Because the list of courts was exclusive, the legislature was without power to create additional courts. Section 1 removed the establishment of lower courts from the constitution and gave the authority to make that determination to the legislature. "[U]nder § 1 of Art VII, as amended in 1910, the Supreme Court is the only court created by the constitution itself; all other courts are to be created by legislative act." *State ex rel Madden v. Crawford*, 207 Or 76, 82, 295 P2d 174 (1956).[4] Article VII (Amended), section 2, retained the existing judicial system only until the legislature exercised its authority under section 1 to modify the system or create a new one. *Id.* at 82-83.

Defendant recognizes that, if section 1 is part of the constitution, it authorizes the legislature to create this court. Defendant argues, however, that none of Article VII (Amended) is part of the constitution because the procedures that led to its purported adoption did not comply with constitutional standards. The consequence, according to defendant, is that Article VII (Original) is the only valid constitutional provision governing the judiciary. Thus, the courts that Article VII (Original), section 1, names are the only constitutionally permissible courts and the legislature had no authority to create this court.[5]

---

[4] Although the people did not repeal Article VII (Original) when they adopted Article VII (Amended), most if not all of the original article has lost its constitutional status and is, in effect, a statute. Article VII (Amended), section 2, provides that the provisions of Article VII (Original) concerning the "courts, jurisdiction, and judicial system" are effective only "until otherwise provided by law." Those provisions, thus, are subject to legislative amendment or repeal at any time. *See, e.g.*, *State ex rel Wernmark v. Hopkins*, 213 Or 669, 678, 327 P2d 784 (1958).

[5] If defendant were correct, then the decisions of this court since its creation in 1969 would remain effective as those of a court *de facto*. *See State ex rel Madden*, 207 Or at 89-90. We would, however, have to stop functioning as a court with regard to cases in which we have not yet issued an appellate judgment.

Defendant argues that the adoption of Article VII (Amended) was procedurally flawed in three separate ways, each of which involved a failure to comply with one of the requirements for amending the constitution, and that any one of those defects is sufficient to invalidate the entire amended article. Defendant asserts, first, that F. W. Benson, who was the elected Secretary of State and who, in 1910, acted in both that capacity and as Governor in canvassing the votes and proclaiming the adoption of Article VII (Amended), was legally neither the Governor nor the Secretary of State. Thus, according to defendant, there never was a legal proclamation of the adoption of Article VII (Amended). Or Const, Art XVII, § 1. Second, defendant asserts that the petitions that voters signed to place Article VII (Amended) on the ballot did not contain "the full text of the proposed * * * amendment to the Constitution." Or Const, Art IV, § 1(2)(d). Finally, defendant asserts that the ballot presented Article VII (Amended) to the people in a way that required voters to vote for or against the article in its entirety, thereby violating the requirement that voters be able to vote separately on separate amendments. Or Const, Art XVII, § 1; *see, e.g.*, *Armatta v. Kitzhaber*, 327 Or 250, 959 P2d 49 (1998). We consider each of defendant's arguments in turn.

■ We begin with the information in the record concerning the status of the governorship in 1910. F. W. Benson was elected Secretary of State in 1906 for a four-year term that began in January 1907. In 1909, the Governor, George W. Chamberlain, was elected to the United States Senate and thereupon resigned the governorship. Under the constitution as it then stood, Benson became the Governor. After assuming that office, Benson also continued to act as the Secretary of State. Benson eventually became ill and temporarily turned over the duties of the governorship to the President of the Senate. He did not resign as Governor, and he retained his position as Secretary of State. Benson later indicated that he intended to resume the duties of Governor, but there is no record that he formally did so. However, on December 3, 1910, Benson acted both as Secretary of State when he canvassed the votes given at the November election and as Governor when he signed the proclamation declaring the adoption of Article VII (Amended).

Those facts may raise a question about whether Benson had the authority of governor *de jure* on December 3, 1910, given the lack of any record that he formally reassumed the duties of that office. We do not, however, need to decide that issue. Benson became Governor in 1909 as the constitutional successor to Chamberlain. He never resigned the office but only turned its duties over to the President of the Senate. He retained the title of Governor until his successor took the oath of office. In light of those facts, we conclude that Benson had a sufficient claim to the office when he proclaimed the adoption of Article VII (Amended) and that, in doing so, he at least exercised the duties of governor *de facto*. Well before 1910, the Supreme Court had established that the actions of an officer *de facto* are valid as to the public and third persons and are not subject to collateral attack. *Hamlin v. Kassafer*, 15 Or 456, 463-64, 15 P 778 (1887); *see also State ex rel Madden*, 207 Or at 89-90 (discussing acts of judge *de facto*); *Holman et al. v. Lutz et al.*, 132 Or 185, 217-22, 284 P 825 (1930) (Coshow, J., concurring) (same).

■ Defendant also challenges Benson's status as Secretary of State, arguing that, when he became Governor he necessarily ceased being Secretary of State. *See State ex rel O'Hara v. Appling*, 215 Or 303, 310-11, 334 P2d 482 (1959) (taking oath as Governor constitutes implied resignation as Secretary of State). Defendant may be correct as to Benson's status *de jure*. However, the term for which Benson was elected Secretary of State had not expired, he continued to act in that office after becoming Governor, and no one had purported to appoint a replacement. Thus, Benson was at least Secretary of State *de facto*, and his actions in that capacity are valid as to third parties for the same reason that his actions in his status as Governor *de facto* were valid. Both Benson's canvassing of the votes as Secretary of State and his proclamation of the adoption of Article VII (Amended) as Governor, therefore, were valid and effective.

■ We next consider defendant's argument that the 1910 initiative petition that proposed the adoption of Article VII (Amended) did not contain the full text of the proposed amendment. There is no dispute that the petition included

the full text of what became Article VII (Amended). Defendant argues, however, that it should also have included the text of the existing Article VII as well as an explanation of what portions of the existing article would remain in effect and how the amended version would relate to the existing version. By not including those items, according to defendant, the petitioners violated the constitutional requirement that the petition set out the complete text of the proposed amendment. In essence, defendant argues that the full text of a proposed amendment includes the text of all provisions that the amendment might affect, not simply the text of the provisions that it would expressly add or amend.

Current Article IV, section 1(2)(d), of the Oregon Constitution was adopted in 1968 to replace Article IV, section 1, which was in effect in 1910. Those sections require that a petition for an initiated measure "shall include the full text of the measures so proposed," *former* Or Const Art IV, § 1 (*repealed by* 1967 Legislative Assembly, HJR 16, approved by the voters May 28, 1968), or "shall include the full text of the proposed law or amendment to the Constitution." Or Const, Art IV, § 1(2)(d). We do not see any distinction between those requirements that is relevant to this case. In both provisions, the constitution requires that the petition contain the full text of the measure to be adopted. However, the constitution does not refer to or establish any requirements relating to the text of any provisions to be repealed outright rather than amended, nor does it require an explanation of how the proposed changes would function with existing unamended provisions. The limited case law on the constitutional full text provision does not suggest that it encompasses either of those types of requirements.

In *Schnell v. Appling*, 238 Or 202, 395 P2d 113 (1964), a proposed initiative contained the entire text of the statutory sections that it would amend, showing the text to be deleted or added, but referred to sections that the initiative would repeal or leave unchanged only by section number. The Supreme Court held that that was sufficient: "Since such matter is no part of the proposed law, it need not be made a part of the initiating petition." 238 Or at 204-05. "The full-text requirement of our constitution means exactly what it

says. The petition must carry the exact language of the proposed measure. It need include nothing more." *Id.* at 205.[6] In *Kerr v. Bradbury*, 193 Or App 304, 89 P3d 1227, *rev allowed*, 337 Or 282 (2004), we held that an initiative petition that contained only the amendatory material, but not the existing text of the statutes to be amended, failed to comply with the constitutional full text requirement.

This case is like *Schnell* and unlike *Kerr*. The 1910 initiative petition contained the full text of the proposed amendment to the constitution. It replaced rather than modified the text of the existing constitutional provisions and, thus, did not raise the issue that we decided in *Kerr*. We see nothing in the constitutional wording or purpose that would require petitioners to include the full text of provisions that the measure expressly repeals. Defendant would go even further than that, apparently requiring petitioners to include the text of existing provisions that would be unchanged but that might be affected in some fashion and also to provide a legal opinion describing the effect of the amendment on the existing but unchanged provisions. Nothing in the constitution suggests such a requirement. The constitution required the petitioners to provide potential signers with the full text of the proposed amendment in the petition; the petitioners did so. The potential legal effect of the amendment on other provisions of the constitution could well provide reasons to support or oppose the proposal, but it was not something that the petition itself had to describe. Indeed, the effect of a constitutional amendment might be sufficiently uncertain that it would be an issue in the debate over the measure. The initiative petition did not violate *former* Article IV, section 1.

Defendant's most substantial argument against the validity of Article VII (Amended), section 1, is that its adoption violated the requirement of Article XVII, section 1, that, "[w]hen two or more amendments shall be submitted * * * to the voters of this state at the same election, they shall be so submitted that each amendment shall be voted on

---

[6] Defendant argues that those statements were *dicta*. They are part of the Supreme Court's explanation for its decision in *Schnell*. Even if they are technically *dicta*, they are the best guide to the court's thinking on the issue before us, and they are consistent with the text of the constitution.

separately." Defendant relies on the test for determining compliance with Article XVII, section 1, that the Supreme Court established in *Armatta*:

"[T]he proper inquiry is to determine whether, if adopted, the proposal would make two or more changes to the constitution that are substantive and that are not closely related. If the proposal would effect two or more changes that are substantive and not closely related, the proposal violates the separate-vote requirement of Article XVII, section 1, because it would prevent the voters from expressing their opinions as to each proposed change separately."

*Armatta*, 327 Or at 277. In applying that test the court looks at both the explicit and implicit changes that the proposed amendment would make to the constitution. *Id.* at 278; *Lehman v. Bradbury*, 333 Or 231, 242-43, 37 P3d 989 (2002).

Defendant identifies a number of ways in which, it believes, Article VII (Amended) violates Article XVII, section 1, under the *Armatta* test. Among other things, the amended article deleted from the constitution all references to courts other than the Supreme Court, as well as all references to the qualifications of judges. It also omitted the original article's description of the selection and duties of county and judicial clerks, sheriffs, and prosecuting attorneys. The amended article changed the standard of judicial review of jury verdicts, abolishing the previous authority to set aside a verdict on the ground that it was excessive or contrary to the clear weight of the evidence and substituting instead an "any evidence" standard of review. *See Van Lom v. Schneiderman*, 187 Or 89, 98-99, 112, 210 P2d 461 (1949). It also permitted criminal defendants to appeal convictions without fear of being found guilty, after a reversal, of a greater offense than the one being appealed. Those and other explicit and implicit modifications to the constitution as it existed before the 1910 amendment show, according to defendant, that Article VII (Amended) made two or more changes to the constitution that were both substantive and not closely related.

Defendant directs its argument solely at Article VII (Amended) as it was when the people adopted it in 1910. However, that article has itself been amended a number of times since its adoption in 1910. Because those amendments

may affect the present validity of the provisions at issue in defendant's motion to dismiss, we must take them into account in considering defendant's arguments. The issue before us is not whether defendant's challenge would have succeeded in 1910 but whether it will succeed today. That is a consideration that did not arise in other recent cases applying the separate vote requirement of Article XVII, section 1. In those cases, the challenges were to recently adopted constitutional amendments that were unchanged since their adoption.[7] In this case, however, defendant challenges an amendment that has been in effect for 95 years and that has itself been amended on a number of occasions.[8] Each of those amendments was based on the premise that Article VII (Amended) is a valid part of the constitution and thus could be the subject of an amendment or repeal. We first consider, therefore, whether any of those amendments validated the portions of Article VII (Amended) that are relevant to the issue before us.

The most significant amendment to Article VII (Amended) for the purposes of this case, and the one on which we will focus, was the adoption in 1962 of Article VII (Amended), section 2b (section 2b). That section is based on

---

[7] In *Lehman,* the Supreme Court held that a constitutional amendment adopted in 1992 that established term limits for state legislators and members of Congress violated the separate vote provision of Article XVII, section 1. Although the challenged amendment was over nine years old at the time of the decision, it had only recently begun to affect legislators and, thus, had only recently become ripe for a challenge. There had been no changes to the amendment since its adoption, and thus there was no basis for considering the effect of a later amendment on the original provision.

[8] As adopted, Article VII (Amended) consisted of sections 1 through 7. In 1974 and 1996 the people amended section 3. 1973 Legislative Assembly, HJR 71, approved by the voters Nov 5, 1974; 1995 Legislative Assembly, HJR 47, approved by the voters May 21, 1996. In 1958, they amended section 5. 1957 Legislative Assembly, SJR 23, approved by the voters Nov 4, 1958. In 1974, they repealed the amended section 5 and replaced it with the current section 5. 1973 Legislative Assembly, SJR 1, approved by the voters Nov 5, 1974. In 1960, they added section 1a. 1959 Legislative Assembly, SJR 3, approved by the voters Nov 8, 1960. In 1958, they added section 2a. 1958 Legislative Assembly, SJR 30, approved by the voters Nov 4, 1958. In 1962, they added section 2b. 1961 Legislative Assembly, SJR 34, approved by the voters Nov 6, 1962. In 1968, they added section 8 and amended it in 1976. 1967 Legislative Assembly, SJR 9, approved by the voters Nov 5, 1968; 1975 Legislative Assembly, SJR 48, approved by the voters May 25, 1976. In 1972, they added section 9. 1971 Legislative Assembly, SJR 17, approved by the voters Nov 7, 1972.

and explicitly recognizes the authority of the legislature to create courts inferior to the Supreme Court. For the reasons that we discuss below, we conclude that it validated the grant of authority in section 1. Thus, even if the adoption of Article VII (Amended) was originally flawed—an issue that we do not decide—that portion of it is now firmly established against a challenge based on Article XVII, section 1. Because that conclusion resolves the issue before us on defendant's motion to dismiss, we do not need to consider the procedural validity of other portions of Article VII (Amended).

Section 2b arose, in part, from problems that the legislature encountered in exercising its authority under section 1 to create courts inferior to the Supreme Court. The legislature began exercising that authority in 1913, when it created a district court with jurisdiction limited to the City of Portland, giving Multnomah County the authority to extend that jurisdiction to the rest of the county. Or Laws 1913, ch 355. From that beginning, the legislature gradually established district courts in other counties; by 1961 there were district courts in 18 counties, including Multnomah, and the legislature had provided for the creation of district courts in three more counties by 1967. Reviser's notes to *former* ORS 46.020 (1961 replacement part) and *former* ORS 46.025 (1961 replacement part). District courts were courts of limited jurisdiction that primarily handled relatively minor cases, such as misdemeanors and civil cases involving relatively small amounts of money. They were inferior to the circuit courts and, where they existed, freed the circuit courts to focus on more significant cases.

The legislature intended to create district courts in specific counties and not in others. In order to do so after 1913, however, it had to comply with Article IV, section 23, of the Oregon Constitution, which prohibits special or local laws regulating the practice in courts of justice. In 1914, the Supreme Court interpreted that provision to prohibit naming the county involved in a legislative change to the judicial system of a particular county. *In re McCormick's Estate*, 72 Or 608, 143 P 915, *on reh'g*, 144 P 425 (1914). In order to satisfy that interpretation, the legislature described those counties where it wanted to establish district courts by population rather than by directly naming each county. As a result, by

1961 the statutes provided for district courts, for example, in "[e]ach city having a population of 10,000 or more which is the county seat of a county having a population of 20,000 or more and less than 24,000," *former* ORS 46.025(a) (1961 replacement part), and "[e]ach city which is the county seat of a county having a population of 13,000 or more and less than 16,000." *Former* ORS 46.025(c) (1961 replacement part). In using that method to identify a specific county or counties, the legislature created a scheme that was both inherently complex and subject to change by a new census.

To avoid those problems, as well as other problems that affected different courts, the 1961 legislature proposed adding section 2b to Article VII (Amended); the people approved the new section at the 1962 general election. In proposing section 2b, the legislature manifested its belief that all of Article VII (Amended), including section 1, was valid and that section 1 gave the legislature the authority to create inferior courts. The enacting clause for the amendment provided that the "Constitution of the State of Oregon is amended by creating a new section to be added to and made part of Article VII (Amended)," a provision that is necessarily based on that premise. The body of section 2b provides:

"Notwithstanding the provisions of section 23, Article IV of this Constitution, laws creating courts inferior to the Supreme Court or prescribing and defining the jurisdiction of such courts or the manner in which such jurisdiction may be exercised, may be made applicable:

"(1) To all judicial districts or other subdivisions of this state; or

"(2) To designated classes of judicial districts or other subdivisions; or

"(3) To particular judicial districts or other subdivisions."

Both the explanation of the proposal in the voters' pamphlet and the argument of the legislative committee in favor[9] referred to the difficulty of writing general laws relying

---

[9] There were no arguments in opposition.

on population that would respond to the different circumstances in different parts of the state. The statement explained:

> "Section 23 of Article IV * * * has been construed by the Supreme Court of Oregon to prohibit the Legislature from changing judicial practices or procedures in any particular county by name, and to require any such change to be made by a general law applicable to all counties in the state, or to all counties of a given class such as those having a population within stated limits. For example, if a particular county, for reasons peculiar to it, desires to have probate or juvenile jurisdiction transferred from the county court to the circuit court * * * the transfer could be accomplished only by a law applicable to all counties of the same general class, even though other counties in the same class may not desire the change. This rule has made it impossible in some instances to make changes desired by a particular county merely because the change was not wanted by another county in the same population class.

> "The present rule has also produced some unintended results. Classifications under section 23 of Article IV have been based, either wholly or partly, on population. Consequently, a change in the population of a particular county may automatically take that county out of its former class and place it in another without any change in the law itself. That happened recently as a result of the 1960 census when Clackamas County by an increase in population was placed in the same class as Marion County, although no one had proposed the change."

Official Voters' Pamphlet, General Election, Nov 6, 1962, Explanation of Measure No. 5. The legislative committee's argument in favor made similar points. *Id.*, Argument in Favor of Measure No. 5.

Section 2b applies to "laws creating courts inferior to the Supreme Court or prescribing and defining the jurisdiction of such courts or the manner in which such jurisdiction may be exercised[.]" It does not purport to give the legislature the authority to create inferior courts but, rather, assumes that section 1 gave it that authority. Without that assumption, section 2b would be meaningless. The question is whether the adoption of section 2b thereby cured any possible defects in the adoption of section 1 that arose from a violation

of Article XVII, section 1. We have not found any cases specifically dealing with constitutional amendments that rely on defective existing constitutional provisions. However, the majority of courts hold that, if an amendment to an unconstitutional statute makes the statute as a whole constitutional, the amendment will be effective and the statute as a whole will be enforceable. Norman J. Singer, 1A *Sutherland Statutory Construction* § 22.4 at 254-56 (6th ed 2002 rev). "Amendment offers a convenient method of curing a defect in an unconstitutional act." *Id.* at 256.

More directly relevant to this issue is the doctrine of the implied validation of an unconstitutional statute by the subsequent adoption of a constitutional amendment. *Beck v. Beck*, 814 SW2D 745 (Texas 1991), provides a relatively recent example of the use of that doctrine. In *Beck*, the Texas courts had previously declared that a statute that authorized certain prenuptial agreements was invalid under the state constitution. The legislature proposed, and the people adopted, a constitutional amendment under which those agreements would be valid. The amendment did not expressly refer to the existing statute or to existing agreements, but the Texas Supreme Court held that the amendment validated the statute and thereby validated the agreement at issue in the case. In doing so, the court described the doctrine of implied validation as providing that a constitutional amendment will impliedly validate an existing act that, without the amendment, would be beyond the legislature's power to enact, so long as the validation does not impair either the obligation of a contract or vested rights. *Id.* at 747-78. It is unnecessary for the amendment to refer to the statute being validated, although in *Beck* the legislative history persuaded the court that the legislature intended to cure the statute and validate existing agreements. *Id.* at 748. What matters is the effect of the new provision; if the existing statute would be valid under the new provision, that provision validates it.

The relevant Oregon case law, although limited, is consistent with this doctrine. In *Nottage v. City of Portland*, 35 Or 539, 58 P 883 (1899), the plaintiff sought to recover money that it had paid for a city street assessment on the ground that the assessment was procedurally defective. The

city defended by pointing out a provision in its amended charter, which the legislature had adopted the previous year, that authorized the city to bring an action to recover an assessment that had been adjudged invalid for any reason. The Supreme Court treated the provision as being intended to validate the assessment at issue and held that the provision was available to the city as a defense against the plaintiff's action. In doing so, the court noted that statutes designed to overcome irregularities or defects in procedures for street improvements were common and that the courts regard them with favor so long as they do not impair vested rights or take property without due process of law. *Id.* at 547-48. It is unnecessary for the later act expressly to validate the actions or legalize the irregularities; "defects of this character may be cured by implication." *Id.* at 556.

Two other cases apply similar principles to statutes that were invalid solely because of procedural defects in the method of their adoption and thus provide direct guidance for this case. In *Wrought-Iron Range Co. v. Carver*, 118 NC 328, 24 SE 352 (1896), the North Carolina legislature passed a tax bill, the Governor signed it, and the Secretary of State included it among the statutes adopted at the legislative session. However, it later appeared that the President of the Senate and the Speaker of the House had failed to sign the bill, as the state constitution required. When the defendant sheriff attempted to collect the tax, the plaintiff challenged its validity. The North Carolina Supreme Court held that the tax was valid, despite the procedural defect, because a properly adopted act of the same legislative session expressly referred to the tax and treated it as effective. The court relied on a Kansas case, *Commissioners v. Higginbotham*, 17 Kan 62 (1876), in which the President of the Senate failed to sign an 1865 act. Subsequent acts in 1866 and 1867 referred to the 1865 legislation and treated it as the law; the Kansas court therefore held that the 1865 act was valid. The North Carolina court agreed with the reasoning of the Kansas court and held that the reference to the defective act in a subsequent act of the same session constituted a validation of the defective law. *Wrought-Iron Range Co.*, 118 NC at 355-56. In both cases, no one had challenged the defective act before the adoption of the statutes that acted as validations.

 In both *Wrought-Iron Range Co.* and *Higginbotham*, the state legislature neither expressly intended to ratify the defective act nor even knew that there was a defect. The acts themselves did not contain any ratifying provisions. Rather, in each case the legislature manifested the belief that the previous act was valid and adopted an additional act based on that belief. The courts held that, despite the legislature's ignorance of the situation, its subsequent action constituted an implied validation of the defective act. Both cases thus apply principles comparable to the doctrine of implied validation to a context that is arguably similar to the one before us. Their reasoning is consistent with Oregon law and is as applicable to procedurally defective constitutional provisions as to procedurally defective statutes. Under that reasoning, when there is a procedural defect in a statute, and when the legislature thereafter adopts additional legislation that is necessarily based on the premise that the statute is valid, the additional legislation will validate the procedurally defective statute. In the same way, when a constitutional amendment has a procedural defect and a later amendment is based on the premise that the original amendment is valid, the later amendment will overcome the effect of the procedural defect. It is irrelevant whether those who propose and approve the later amendment know of the defect or intend to correct it; it is sufficient that they adopt the second amendment based on the premise that the original amendment is valid. If they do so, they will thereby implicitly validate the original amendment.

In this case, section 1 had been in effect for more than 50 years before the legislature proposed and the people adopted section 2b, and no one had challenged its validity on procedural—or, so far as we can tell, any other—grounds. The legislature and the people both acted on the premise that section 1 authorized the legislature to create whatever courts inferior to the Supreme Court that it believed to be appropriate. One of the problems that section 2b resolved—the legislature's inability to create inferior courts by specifically naming counties—could be a problem only if the legislature had the authority to create such courts in the first place. Section 2b is meaningless unless section 1 is a valid part of the constitution. In adopting section 2b, the people impliedly validated the portion of section 1 that authorizes the legislature

to create inferior courts. If section 2b is itself valid, it validated any violation of Article XVII, section 1, that might have occurred in the adoption of section 1.

■ The remaining question is whether section 2b itself satisfied the separate vote requirement. It is clear that it did. Even assuming that the adoption of section 2b made two or more substantive changes to the constitution, those changes are closely related to each other and to section 1. Section 1 authorizes the legislature to enact laws creating courts inferior to the Supreme Court, and by necessary implication, laws defining the jurisdiction of those courts and the manner in which such jurisdiction may be exercised. Section 2b states that those laws need not be made applicable statewide but, instead, may be made applicable only to particular judicial districts or to certain classes of judicial districts. Thus, there is a strong logical connection between the provisions of section 2b and section 1 in that section 2b describes the manner in which the authority granted in section 1 may be carried out. The sections are also logically connected in that section 2b assumes the existence of section 1 and depends on it for its existence. As a result, the voters could not logically have adopted section 2b without implicitly accepting the validity of the relevant portions of section 1. Because of those essential logical connections, the provisions of section 2b are closely related to each other and to section 1, and the adoption of section 2b validates section 1.

We turn at last to the facts of this case.[10] For many years defendant has owned houses in Portland and rented them to tenants. In 1985, one of defendant's owners, Fred Benson, died in a car crash. Its remaining owner, Harry Benson, a lawyer, was ill and wanted to retire. He was also concerned about maintaining an adequate income flow for his wife if he should die. At least in part for those reasons, in 1987 defendant began selling houses on contract; there is

---

[10] In a declaratory judgment action, our standard of review of the facts depends on whether the action is equitable or legal in nature. *Ken Leahy Construction, Inc. v. Cascade General, Inc.*, 329 Or 566, 571, 994 P2d 112 (1999). Based on the supplemental relief that plaintiffs seek, this case is more likely equitable than legal. However, the trial court found that both parties had proved the facts that they described in their trial memoranda, and on *de novo* review we would agree. We therefore do not need to decide the underlying nature of this case. The facts that we describe are consistent with those that we described in our previous decision. *Carey*, 165 Or App at 659-62.

some suggestion in the record that defendant chose to sell those houses that were in the poorest repair. At the same time, plaintiffs, who had been married less than a year and were living in a small apartment, were interested in a larger residence in order to have a place for a family. Their options for housing were limited because David was working only 25 hours a week as a school bus driver and Tanya was unemployed. Among the houses that defendant wanted to sell was a house near where David's parents lived. That house had been vacant for several years, with only vagrants living in it, and it had deteriorated to a deplorable condition. Among other things, the house leaked from many locations and was filled with trash, diapers, needles, and drug paraphernalia. Plaintiffs did not know the details of the condition of the house, but they knew that it had serious problems.

On May 20, 1987, plaintiffs and David's parents went to defendant's office, where Benson agreed to rent the house to them for three years with an option to purchase it within that period for $17,950. The lease expressly stated that the house had deficiencies and that plaintiffs accepted it as is. Plaintiffs agreed in the lease to make the house habitable. Plaintiffs and Benson also agreed orally that plaintiffs would perform any necessary maintenance on the house. For plaintiffs, the lease-option provided an opportunity to obtain housing by their own efforts that they could not otherwise have afforded. During the three years that they rented the house, plaintiffs and David's parents worked to rehabilitate it, while plaintiffs and their growing family lived in it. During that period, David also obtained better-paying employment.

At the end of the term of the lease, Benson asked plaintiffs to exercise their option to purchase. They did so on June 14, 1990, purchasing the property by a land sale contract for a price that included some credit for the rent that they had paid. Benson prepared the contract, using a printed form but adding substantial material of his own. The crucial provisions are:

"This agreement is personal by and between the parties hereto *and cannot be sold, assigned or hypothecated without written consent of first party [defendant].*

"The purchase price of $16,793.06 to be paid in monthly installments of not less than $225/mo including interest at the rate of twelve per cent per annum on the unpaid principal balance, said payments to be made on or before the 30th of each and every month beginning with the month of June, 1990 and continuing until the sum of $16,793.06 together with interest thereon has been paid in full.

"In addition to be [*sic*] above monthly payments, second party [plaintiffs] shall pay taxes and insurance premiums, estimated at this time of [*sic*] amount to $44.00 per mo[nth], said payment to be adjusted as taxes and insurance premiums increase or decrease.

*"Second party shall not pay more than $2,000.00 on the unpaid principal balance during any one calendar year."*

(Emphasis added.) The material that Benson added to the form contract includes the emphasized provisions. Before plaintiffs signed the contract, Benson read it to them, but he did not discuss those provisions or describe their effect on plaintiffs' ability to sell the house. Plaintiffs had no experience in real estate transactions and did not understand those things.

After purchasing the house, plaintiffs continued to make repairs, financing some of the work with mortgage loans from defendant and from the Portland Development Commission. Much of that work was necessary for the house to meet required habitability standards. During this period, David's employment situation and plaintiffs' finances improved. In 1996, plaintiffs decided to sell the house and listed it with a realtor who specialized in lower-priced homes directed toward first-time buyers. That realtor reviewed the contract and identified the emphasized provisions as potential problems in selling the house. He found in practice that the provision restricting prepayment made it almost impossible to find interested buyers. Potential purchasers did not want to become responsible for the contract and its terms; some lost interest as soon as they learned that defendant was involved. In any case, financing was difficult or impossible to obtain for a purchase that involved accepting an assignment of the contract.

Despite these problems, plaintiffs' realtor was able to obtain a buyer in December; he testified that he could have sold the house to several other potential purchasers if it were not for the provisions at issue. However, the buyer who agreed to the purchase, like the others potentially interested, insisted that he be able to acquire the house free of defendant's interest. The realtor and plaintiffs attempted to get defendant to waive the limitations. Defendant agreed to do so only in return for a payment that included an additional $13,000 as consideration for the waiver. That amount was essentially equal to plaintiffs' equity in the house. It is not clear from the record how defendant arrived at the $13,000 figure; it does not assert that it did so by considering either the tax consequences of early payment, the loss of planned cash flow, or the need to ensure that the purchaser was financially responsible. Because of their inability to pay off the contract, plaintiffs were unable to complete the proposed sale or any other. As a result, they brought this declaratory judgment action attacking the validity of the contractual terms limiting payments on principal and requiring consent to an assignment. Among other things, they asked the court to determine the amount necessary to pay defendant in full and to declare that plaintiffs could pay that entire balance and receive title free of any interest of defendant's.

The trial court originally granted summary judgment to plaintiffs, holding that the provisions were void because defendant had not complied with the requirements of ORS 82.170 for loan agreements and because they constituted an unreasonable restraint on alienation. It did not rule on plaintiffs' assertion that the provisions were unconscionable. On appeal, we reversed. *Carey*, 165 Or App at 672. We held that the provisions neither came within the regulation of loan agreements in ORS 82.170 nor violated common-law rules prohibiting unreasonable restraints on the alienation of land. In considering plaintiffs' argument that the provisions constituted an unreasonable restraint on alienation, we balanced the justification for the restraint against the amount of restraint that the provisions, separately or together, actually imposed. *Carey*, 165 Or App at 668. In doing so, we necessarily evaluated the provisions on their face rather than in the

context of the parties' situations; the question before us was whether the clauses were void in all circumstances.

We began our discussion of the unreasonable restraint issue with the provision that plaintiffs "shall not pay more than $2,000 on the unpaid principal balance during any one calendar year."[11] We stated that the justification for that restriction is to provide the vendor a fixed cash flow that would include interest and minimize capital gains taxation.[12] We noted that the restriction could apply for as few as nine years[13] if plaintiffs made the maximum permitted payments and that, even during that period, plaintiffs could assign the contract and defendant could not unreasonably withhold consent to the assignment. The balance, therefore, favored the enforceability of the provision. 165 Or App at 668-69.

We then turned to the provision that the contract "cannot be sold, assigned or hypothecated without written consent of first party." We noted that the justification for that provision was to protect defendant's interest in preventing the sale of the property to an irresponsible or insolvent third party. We recognized the rule that the parties to a contract must perform it in good faith in order to effectuate the reasonable expectations of the parties. In this context, we held, the good faith requirement meant that the provision did not give defendant an arbitrary right to refuse consent. In *Pacific First Bank v. New Morgan Park Corp.*, 319 Or 342, 876 P2d 761 (1994), the Supreme Court had applied the good faith rule to the assignment of a lease that contained a

---

[11] Defendant construes the provision to limit additional principal payments to an amount equal to $2,000 less the principal portion of plaintiffs' regular contractual payments. Defendant does not discuss how that construction meshes with the fact that, at least during the last calendar year under the contract, the required contract payments by themselves would include payments on principal greater than $2,000.

[12] The evidence at trial indicates that that was defendant's expressed reason for including the clause in the contract. However, the evidence also indicates that it is questionable whether defendant would have capital gains tax liability on this house at the price at which it sold it to plaintiffs.

[13] We apparently calculated that period by dividing the original loan amount by $2,000. However, if plaintiffs would not have to reduce the contractually required payments to avoid paying more than $2,000 a year on principal, *see* 203 Or App at 419 n 11, it would be theoretically possible to pay off the loan in fewer than eight years.

restriction on assignment that was absolute in its terms. Because of the good faith requirement, the court held, there "is engrafted on this language by implication the phrase 'which consent shall not be unreasonably withheld.'" *Carey*, 165 Or App at 670 (quoting *Pacific First Bank*, 319 Or at 353) (internal quotation marks omitted). We held that the same phrase is also engrafted on a consent to assignment clause in a land sale contract and that, with that addition, the provision was valid and enforceable. *Carey*, 165 Or App at 670-71. Finally, we concluded that the two provisions together were not unreasonable restraints on alienation, primarily because the limited restriction on assignment meant that plaintiffs could sell the house subject to the contract even if they could not fully pay off the contract as part of doing so. *Id.* at 671. Based on those conclusions, we remanded the case to the trial court for it to consider plaintiffs' arguments that the provisions are unconscionable. *Id.*

On remand, the court concluded, after a trial, that plaintiffs had not shown that the provisions were unconscionable and entered the judgment for defendant from which plaintiffs appeal. The court first concluded, relying on our decision in *Rosboro Lumber Co. v. EBI*, 65 Or App 679, 682, 672 P2d 1336 (1983), *rev'd on other grounds*, 297 Or 81, 680 P2d 386 (1984), that unconscionability cannot be a basis for affirmative relief, which is what it believed plaintiffs were seeking. It then stated that, if it were to reach the issue, the relevant factors ultimately, but barely, weighed in favor of concluding that the clauses in question are not so unconscionable as to be unenforceable as a matter of law. We first discuss Oregon law concerning unconscionable contractual provisions, then explain why it was appropriate for plaintiffs to rely on that law in this case, and finally conclude, on the merits, that the provisions as written are unconscionable and that we must limit their application in order for them to be enforceable.

Oregon courts have recognized their power to refuse to enforce unconscionable contracts since the nineteenth century. *See Caples v. Steel*, 7 Or 491 (1879) (court may refuse specific performance if bargain is unconscionable); *Balfour v. Davis*, 14 Or 47, 12 P 89 (1886) (refusing to award attorney

fees because amount specified in contract was unconscionable). Since the adoption of the Uniform Commercial Code, the courts have relied on ORS 72.3020 and, later, *Restatement (Second) of Contracts* § 208 as providing the standard for determining whether a contractual provision is unconscionable. Although the statute applies directly only to contracts for the sale of goods, it influenced the subsequent *Restatement*, which generally follows it. *See, e.g., W. L. May Co. v. Philco-Ford Corp*, 273 Or 701, 543 P2d 283 (1975) (sale of goods); *Best v. U. S. National Bank*, 78 Or App 1, 10, 714 P2d 1049 (1986), *aff'd on other grounds*, 303 Or 557, 739 P2d 554 (1987) (*Restatement* § 208 follows the UCC, and the UCC is generally influential in nonsales cases). ORS 72.3020 provides:

"(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

"(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination."

*Restatement* § 208 provides:

"If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result."

The terms of the statute and *Restatement* focus on providing a procedure for resolving unconscionability issues rather than providing direct guidance about whether a particular provision is unconscionable. However, the commentaries give some help on that point. The official commentary to UCC § 2-302, which is ORS 72.3020, states that

"[t]he basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract. * * * The principle is one of the prevention of oppression and unfair surprise * * * and not of disturbance of allocation of risks because of superior bargaining power."

*Quoted* in *W. L. Macy*, 273 Or at 707 (court's emphasis deleted). The commentary to the *Restatement* explains:

"The determination that a contract or term is or is not unconscionable is made in the light of its setting, purpose and effect. Relevant factors include weaknesses in the contracting process like those involved in more specific rules as to contractual capacity, fraud, and other invalidating causes; the policy also overlaps with rules which render particular bargains or terms unenforceable on grounds of public policy."

*Restatement* at § 208 comment a. Other considerations include

"gross inequality of bargaining power, together with terms unreasonably favorable to the stronger party, [which] may confirm indications that the transaction involved elements of deception or compulsion, or may show that the weaker party had no meaningful choice, no real alternative, or did not in fact assent or appear to assent to the unfair terms."

*Id.* at 208 comment d. Oregon cases generally focus on the procedural issues, *see Best v. U. S. National Bank*, 303 Or 557, 560, 739 P2d 554 (1987), or involve provisions that the courts conclude are not unconscionable. *See Meyer v. Kesterson*, 151 Or App 378, 394, 950 P2d 896 (1997), *rev den*, 327 Or 123 (1998).

It is not surprising that attempts to describe unconscionability lack precision; the concept is designed to cover a wide variety of situations. The primary focus, however, appears to be relatively clear: substantial disparity in bargaining power combined with terms that are unreasonably favorable to the party with the greater power may result in a contract or contractual provision being unconscionable. Unconscionability may involve deception, compulsion, or lack

of genuine consent, although usually not to the extent that would justify rescission under the principles applicable to that remedy. The substantive fairness of the challenged terms is always an essential issue.

■ Like the determination of unconscionability, the remedy for unconscionable contractual terms is flexible. Although one remedy under ORS 72.3020 and the *Restatement* is to refuse to enforce the contract, those authorities also permit the court to excise the unconscionable provision or to limit its applicability so that it is no longer unconscionable. The court can thereby keep the overall contract in effect and achieve the purposes of the parties in a fashion that is not unconscionable. It can thus provide the weaker party the benefit that it thought it would obtain when it agreed to the contract.

■ Before discussing how those principles apply to the challenged provisions, we first consider the trial court's conclusion that plaintiffs were seeking to use the doctrine of unconscionability to obtain affirmative relief rather than as a defense and that their doing so was improper. The court relied on our decision in *Rosboro*, which we explained further in our decision in *Best*. In *Rosboro*, the plaintiff asserted a claim for relief for unconscionable conduct; it did not seek the remedies that the statute and *Restatement* provide if all or part of a contract is unconscionable. We rejected that attempt to make unconscionability an independent claim for damages. We pointed out that *Restatement* § 208 permits a court to refuse to enforce an unconscionable contract, to enforce it without the unconscionable term, or to limit the application of the unconscionable term to avoid an unconscionable result. We could find no authority for holding that "an affirmative claim for damages may be maintained when unconscionability permeates a contract," and therefore concluded that, "although unconscionability may be a defense to the enforceability of a contract, it is not a basis for affirmative relief." *Rosboro*, 65 Or App at 682. Our holding, thus, was that unconscionability is not a basis for a separate claim for relief.

In *Best*, we expanded on *Rosboro*. In *Best*, the plaintiffs asserted that the amounts that the defendant bank charged for nonsufficient funds checks were unconscionably

excessive. Based on that allegation, the plaintiffs sought restitution of the excessive charges. The trial court ruled, relying on *Rosboro*, that unconscionability could not be the basis for affirmative relief, and we affirmed that decision. In *Best*, we agreed with the trial court that the plaintiffs could not obtain restitution on that ground, citing a number of cases in support, 78 Or App at 10-13, and concluded that "unconscionability is not a basis for affirmative relief[.]" *Id.* at 13. On review, the Supreme Court pointed out that we had erred in considering the issue at all. The contract between the plaintiffs and the defendant bank did not include the amount that the bank would charge for NSF checks but simply noted that their accounts were subject to the bank's service charges. Thus, there was no basis for concluding that the contract was unconscionable at the time it was made, which is the proper time to evaluate it. *Best*, 303 Or at 560-61. Because of its disposition of the issue, the court expressly refused to express an opinion on our conclusion that unconscionability cannot be the basis for affirmative relief. *Id.* at 561 n 3.

The significant difference between *Rosboro* and *Best*, on the one hand, and this case, on the other, is that plaintiffs in this case do not seek to recover damages or otherwise obtain affirmative relief except under the contract itself. Both ORS 72.3020 and *Restatement* § 208 authorize the court to refuse to enforce an unconscionable contract, to delete the unconscionable provisions, or to limit the application of those provisions. If the court deletes or limits the unconscionable provisions, it can then enforce the contract in a way that is not unconscionable. It is true that a deletion or limitation may give the previously disadvantaged party new rights *under the contract*, such as a claim for breach of contract that the party did not previously have. That claim for breach does not permit the plaintiff to recover separate damages for unconscionable conduct; rather, it simply permits the plaintiff to enforce the contract as altered so that it is no longer unconscionable. It is not the kind of affirmative relief that concerned us in *Rosboro* and *Best*. Rather, if we conclude in this case that the challenged provisions are unconscionable

and therefore alter them, plaintiffs may be able to assert contractual claims that would not have previously existed. In doing so, they will not be claiming affirmative relief for defendant's imposition of unconscionable provisions on them; they will be asserting only the rights that the contract gives them. The trial court erred in ruling for defendant on this ground.

The final issue is whether the challenged provisions are, as a matter of law, unconscionable. That requires us to consider the conditions under which plaintiffs and defendant entered into the contract to purchase the house and the purpose of the provision in that context. The house was one of a number that defendant wanted to get off its hands. After years of neglect, finding a tenant, and then a purchaser, who would invest substantial effort into rehabilitating the house was probably the best way for defendant to get value from it. The low price for which defendant sold the house was a sign of its deteriorated condition. There is no reason to believe that the house was worth more than the price that defendant asked for it.

At the time of the contract, plaintiffs had lived in the house for three years as renters, during which they had worked to make it habitable, although there was still much to do. They had no other apparent choice for adequate housing for their family. Their need to purchase was far greater than defendant's need to sell. In addition, purchasing at a low price would enable them, when they sold the house, to benefit from the increased value that they had created through their efforts. Plaintiffs had no experience in buying houses, while Benson, defendant's principal, was a lawyer who had been in the business for many years. Defendant knew the effect of the challenged provisions, but plaintiffs did not. Even if plaintiffs had known the effect of those provisions, they were in no position to bargain with defendant over them. There was thus substantial inequality of bargaining power and knowledge between plaintiffs and defendant. In short, defendant imposed those provisions for its own benefit. Although there is no evidence of trickery or deceit, as there often is in unconscionability cases, the gross inequality in knowledge and

bargaining power is sufficient to require us to consider the substance of the challenged provisions.

■■ ■ We begin with the prohibition on assigning the contract without defendant's consent. As defendant points out, after our previous decision in this case it is clear that that provision is subject to the requirement that defendant may not unreasonably withhold its consent. In addition, it is also clear that the primary issue for defendant to consider in deciding whether to consent is the financial responsibility of the putative assignee. *Carey*, 165 Or App 670-71. We must, however, evaluate the challenged provisions as of June 1990, the time of contract formation, not 10 years later when we issued our previous decision. *Best*, 303 Or at 560. At that time, Oregon law did not clearly provide that a requirement for consent to an assignment of a lease necessarily included a reasonableness component.[14] Indeed, the only case on point, *Abrahamson v. Brett*, 143 Or 14, 21 P2d 229 (1933), expressly held the opposite. In *Abrahamson*, the Supreme Court stated that, when there is no reasonableness clause, a landlord "may arbitrarily withhold his assent without giving any reasons, and in granting his assent may impose such conditions as he sees fit." *Id.* at 22. Little more than a year before the parties entered into this contract, we held that it was at least arguable that *Abrahamson* was still good law despite the trend in other states away from that position. *Chiles v. Robertson*, 94 Or App 604, 629-30, 767 P2d 903, *modified on recons*, 96 Or App 658, 774 P2d 500, *rev den*, 308 Or 592 (1989). When plaintiffs sought to sell the house, defendant treated the provision as giving it the right to impose conditions that were unrelated to the purchaser's financial strength, an action that suggests that that was what defendant intended the provision to mean when it included it in the contract. Defendant apparently adhered to that understanding until plaintiffs began this litigation, which was after the Supreme Court's decision in *Pacific First Bank*. At that point defendant argued that, as we ultimately held, the provision contained a reasonableness component as a matter

---

[14] In our previous decision we treated the requirements for consent to assignment of a lease and consent to assignment of a land sale contract as identical for these purposes; we continue to adhere to that understanding.

of law. We conclude that, at the time of the contract, defendant intended the restriction on assignment to be absolute.

If we construe the consent provision as defendant originally intended it, the provision is clearly unconscionable. There is no evidence of a commercial need for an absolute restriction on assignment in this situation; the only effect of the provision is to make it difficult for plaintiffs to sell the house and to give defendant an unwarranted opportunity to seek a windfall in return for letting them do so. If we had not already included a reasonableness condition as a matter of law for another reason, we would limit the operation of the provision in order to include a reasonableness condition. Because that condition is now part of the clause, we do not need to add it a second time. With the addition of that condition, this provision is no longer unconscionable.

█ The second provision imposes limits on payments on principal. In our previous decision, we did not find it necessary to modify that provision in order to hold that such limitations are not *per se* unreasonable restraints on alienation. We hold now that this limitation is unconscionable in the context of this specific contract. In our previous decision, we described the purpose of the provision as being to "provide vendors with a fixed cash flow over a certain period of time 'with minimal taxation and with interest.'" *Carey*, 165 Or App at 669, *quoting Landura Corp. v. Schroeder*, 272 Or 644, 651, 534 P2d 150 (1975). We emphasized that the limitation could last for as few as nine years and that, even during that period, plaintiffs could assign the contract and defendant could not unreasonably withhold consent. *Id*. The evidence at trial places this contract provision in a somewhat different light. First, the evidence shows that, in this specific market— inexpensive housing for first-time buyers in this part of Portland—the financing necessary to permit a purchaser to assume the contract is difficult, if not impossible, to find, while financing for a straight purchase is available.[15] The likelihood of a purchaser being able to assume the contract

---

[15] We recognize that the evidence at trial concerns the situation at the time that plaintiffs attempted to sell, which was six years after they entered into the contract. However, in the absence of any contrary evidence, it is reasonable to infer that the situation in 1990 was the same as it was only six years later.

without financing also appears to be very low. Second, defendant offered no credible evidence that it would incur capital gains tax liability on this particular property. Its witness, who should have known, could not testify to the necessary information. Thus, defendant may not need to spread out payments for tax reasons. Third, the provision gives defendant the ability to require a payment in order for plaintiffs to be able to pay the contract and sell the house. It can set the amount of the payment arbitrarily, with no relationship to the reasons that we described for the provision. The amount that defendant actually demanded—$13,000—was, for all practical purposes, plaintiffs' entire equity in the house. Defendant has used similar provisions in other contracts to require substantial payments as a condition of permitting other purchasers to sell their houses.

The power that the limitation on prepayment gives defendant, thus, is entirely disproportionate to its purpose. Because as a practical matter plaintiffs are unable to sell the house without paying the contract in full, this provision places plaintiffs at defendant's mercy. The contract that defendant created, thus, entirely fails to recognize plaintiffs' interest in selling the house and recovering the equity that they had accrued, equity that in substantial part was the result of their rehabilitating a house that defendant had permitted to deteriorate.[16] Rather, the contract gives all of the power to defendant as a consequence of defendant's greater bargaining strength and knowledge. Such a result is inherently unconscionable. We must decide, therefore, how to give effect to the contract without the unconscionable effect of this provision as written. We do not think that it is necessary to refuse to enforce the provision entirely; as we held in our previous opinion, it can serve a legitimate purpose. Rather, we will limit the provision to provide that defendant may enforce it only to the extent that it can show that the provision will fail to achieve its essential purpose if it is not enforced and

---

[16] Again, although many of these things did not become clear until plaintiffs tried to sell the house, they were inherent in the contract from the time of its formation. The parties knew that plaintiffs would continue to work on the house. Defendant knew the power that the provisions gave it over a later sale and that the contract failed to protect plaintiffs' ability to preserve the equity that they would create. The unconscionability that we have identified existed at the formation of the contract.

that, even then, that its enforcement will not deprive plaintiffs of a substantial benefit of the contract—their ability to sell the house and receive all or the major portion of its increased value. Plaintiffs are entitled to a declaratory judgment that limits the applicability of the prepayment provision in that fashion and to whatever other relief may presently flow from that limitation.

Reversed and remanded.