Argued and submitted July 10, 2006, reversed and remanded for entry of order compelling arbitration of respondent's counterclaim January 3, petition for review denied April 24, 2007 (342 Or 644)

DEX MEDIA, INC.,
a foreign corporation,
*Appellant,*

*v.*

NATIONAL MANAGEMENT SERVICES, INC.,
an Oregon corporation,
*Respondent.*

0402-01435; A128010

150 P3d 1093

Michael H. Simon argued the cause for appellant. With him on the briefs were Sarah J. Crooks and Perkins Coie LLP and Greg A. Pfister.

Kevin H. Kono argued the cause for respondent. With him on the brief were John F. McGrory Jr. and Davis Wright Tremaine LLP.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Cramer, Judge pro tempore.

EDMONDS, P. J.

**EDMONDS, P. J.**

Plaintiff DEX Media, Inc. (DEX) brought claims against defendant National Management Services, Inc. (NMS) for breach of contract and for services sold and delivered. NMS brought a counterclaim alleging breach of a separate agreement. DEX appeals from the trial court's order denying its motion to compel arbitration of NMS's counterclaim. We reverse and remand for entry of an order compelling arbitration.

DEX publishes yellow pages directories. NMS is an independent certified market representative authorized by various yellow pages publishers to solicit and sell advertising for placement in directories. The parties did business together for a number of years without a written agreement. In March 2003, the parties executed a written certified marketing representative agreement (the Agreement), which authorized NMS to sell national yellow pages advertising to be published in DEX's directories.

The Agreement was effective as of March 25, 2003. Pursuant to the Agreement, NMS would solicit and sell advertising. NMS would submit the solicited advertising to DEX for approval and acceptance. NMS would bill national advertisers for the advertising, and DEX, in turn, would bill NMS for all advertising that DEX accepted. Unless otherwise stipulated by DEX, NMS was required to pay DEX within 30 days of receiving an invoice. NMS earned a commission on advertising orders, which appeared as deductions on the bills that DEX sent to NMS. The Agreement reserved to DEX the right to accept late payments. The Agreement further provided that it

> "(a) supersedes any and all prior understandings, whether verbal or oral, express or implied concerning the subject matter hereof, (b) constitutes the entire agreement between the parties concerning the subject matter hereof, and (c) may not be waived, amended or modified by either party[.]"

NMS became delinquent in its payments to DEX. In June 2003, DEX's customer service representative sent to NMS a letter setting forth a previously agreed-to payment

schedule for past due invoices and requiring that NMS "maintain the current balances." We refer to this document as the Payment Plan.[1] NMS allegedly failed to comply with the schedule set forth in the Payment Plan. In August 2003, DEX declared NMS to be in default and terminated the Agreement. DEX then began to cancel NMS's outstanding orders and notified NMS's customers of the cancellations.

DEX filed a complaint against NMS alleging two claims. The first claim, for services sold and delivered, was based on NMS's delinquency for advertising sold by NMS from December 2002 through March 13, 2003, and sought damages of over $1,000,000, plus interest. The second claim, for breach of contract, was based on NMS's failure to pay for advertising services "as set forth in" the Agreement, and sought damages of $530,650, plus interest.

NMS filed a counterclaim, asserting that DEX had "a longstanding contractual relationship through which NMS sold national yellow page advertising for DEX and its predecessors in interest." NMS alleged that DEX "breached its agreement to a payment plan, as well as its covenant of

---

[1] The Payment Plan provides, as relevant:

"Per your discussion with Sharon Rabie, and references to previous discussion with Lynn Wood, on June 10, 2003 [DEX] is to be receiving $150,000.00 per month. As we discussed payment arrangements must be kept and **maintain the current balances.** In addition you have agreed to make payments toward you[r] Portland balance.

| "May 2003 received | $ 56,779.77 |
| "June 2003 received | $ 94,745.88 |
| | $151,525.65 |

"[DEX] is still expecting $148,474.35 by the end of June to maintain original agreement.

| "July 30, 2003 | $150,000.00 to be received |
| "August 30, 2003 | $150,000.00 to be received |

"On August 11, 2003, I will be reviewing your account regarding late payment & finance charges which at this time are $88,778.18.

"Extension of credit with [DEX] is dependent upon your meeting our terms of payment. Payment is due no later than thirty calendar days from the date shown on the Invoice Summary Statement.

"Failure to adhere to the above payment arrangements could result in the immediate request of all money due and/or referral of your account to our legal department or collection agency."

(Boldface in original.)

good faith and fair dealing" by (1) withdrawing from the payment plan and demanding full and immediate payment; (2) cancelling or threatening to cancel unpublished orders that NMS had received from its customers; (3) contacting NMS's customers and telling them they did not have to pay NMS; and (4) threatening NMS's customers that they would lose all advertising if they did not reorder their advertising through DEX. NMS alleged that, as a result of DEX's breach, it has been damaged due to its inability to continue to make sales, to continue to collect from its customers, and to continue in business.

DEX filed a motion for an order to stay or abate NMS's counterclaim, arguing that it is subject to arbitration under the Agreement's arbitration clause, pursuant to the Federal Arbitration Act, 9 USC sections 1 to 15 (FAA). The trial court denied DEX's motion, reasoning that a breach of the Payment Plan was not subject to the Agreement's arbitration provision and that the Payment Plan had no provision for arbitration. Believing that it had no right to an immediate appeal of the trial court's ruling, DEX filed a petition for writ of mandamus in the Oregon Supreme Court. It then withdrew its petition and filed a petition to compel arbitration pursuant to ORS 36.625, which the trial court denied, ruling that NMS's counterclaim is not subject to an agreement to arbitrate. DEX appeals that ruling under ORS 36.730.[2]

NMS moved to dismiss the appeal as untimely, on the ground that the notice of appeal was filed more than 30 days after the initial ruling denying DEX's motion to stay the counterclaim. We denied the motion by order. Initially, NMS asks us to reconsider our order denying its motion to dismiss the appeal, contending that the ruling under appeal is identical in substance to the trial court's previous ruling on DEX's motion to abate, and that the petition to compel arbitration was simply a mechanism for generating a new 30-day window in which to file an appeal. In the order denying the motion to dismiss, Chief Judge Brewer explained that there is no right to an immediate appeal from an order denying a

---

[2] ORS 36.730(1) provides, in part, that an appeal may be taken from "[a]n order denying a petition to compel arbitration."

stay and that DEX therefore could not have sought review of the trial court's order denying the stay until after the entry of final judgment. *See Budget Rent-A-Car v. Todd Investment Co.*, 43 Or App 519, 521, 603 P2d 1199 (1979) (order denying stay of judicial action not appealable). Accordingly, the 30-day period for appealing did not run from that order. In contrast, there is a right to a direct appeal of an order denying a petition to compel arbitration, and DEX timely appealed that order. For that reason, the court denied the motion to dismiss. We decline to reconsider that order.

■■ In its single assignment of error, DEX contends that the trial court erred in denying its petition to compel arbitration of NMS's counterclaim. The parties have incorporated the provisions of the FAA into the Agreement.[3] As the Supreme Court stated in *Industra / Matrix Joint Venture v. Pope & Talbot*, 341 Or 321, 142 P3d 1044 (2006), arbitration under the FAA is based on contract. In construing a valid arbitration agreement within the coverage of the FAA, the court applies ordinary principles of state contract law to determine whether the parties have agreed to arbitrate a particular dispute. *Id.* at 331. Before a court may compel arbitration under the FAA, the court must determine both that the parties are *bound* by a valid arbitration agreement and that the particular type of controversy between the parties is within the *scope* of that agreement. *Id.*

---

[3] 9 USC § 2 provides:

"A written provision in any * * * contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

9 USC § 3 provides:

"If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration."

The Agreement provides that the laws of the State of Colorado govern its interpretation. Accordingly, to the extent that Colorado law does not undermine the policies of the FAA, it governs our interpretation of the Agreement. *Volt Info. Sciences v. Leland Stanford Jr. U.*, 489 US 468, 478, 109 S Ct 1248, 103 L Ed 2d 488 (1989); *Industra/Matrix Joint Venture*, 341 Or at 330; *Allen v. Pacheco*, 71 P3d 375, 378 (Colo 2003); *City & County of Denver v. Dist. Court*, 939 P2d 1353, 1361 (Colo 1997).

■ Most of the issues on appeal relate to whether NMS's counterclaim is within the scope of the arbitration clause of the Agreement, and we therefore address that question first. The determination entails, initially, an interpretation of the arbitration clause. The arbitration clause provides, in part:

> "Any claim, controversy or dispute between [NMS] and [DEX], whether in contract, statute, tort, fraud, or otherwise (other than an action by [DEX] for the collection of amount[s] due hereunder), which is not resolved through good faith negotiations, shall be resolved by arbitration in accordance with the Federal Arbitration Act, 9 U.S.C. Sects. 1-15, the provisions of which are incorporated herein by reference."

The Agreement further provides that the arbitration clause "shall survive any termination of this Agreement." The arbitration clause, read in the context of the survival provision, would appear to encompass *any* future dispute between the parties on any matter, with the exception of DEX's claims for the collection of amounts due under the Agreement.

NMS asserts that the parties cannot conceivably have intended the clause to have such a sweeping application, so as to require in perpetuity that the parties submit all future claims of any nature, including those involving events unrelated to and occurring after termination of the Agreement. The literal meaning of the clause is indeed so broad. However, DEX's counsel acknowledged in oral argument that, as a practical matter, the arbitration clause is reasonably understood to apply to any dispute arising between the parties, *as long as it relates to the Agreement.* DEX also acknowledges that, strictly speaking, NMS's counterclaim is

not pleaded as a breach of the Agreement; rather, the counterclaim asserts a breach of the Payment Plan. DEX declines, however, to characterize the Payment Plan as a contract separate from the Agreement. In DEX's view, the Payment Plan, as evidenced by the letter, is simply an implementation of DEX's right under the Agreement to make alternative arrangements with NMS for payment of delinquent amounts, and those terms are inextricably linked to the Agreement.

■ DEX further notes the strong federal policy favoring enforcement of contractually agreed-upon arbitration clauses and the general rule that all doubts are to be resolved in favor of arbitration. *Industra / Matrix Joint Venture*, 341 Or at 332 (citing *Moses H. Cone Hospital v. Mercury Constr. Corp.*, 460 US 1, 24-25, 103 S Ct 927, 74 L Ed 2d 765 (1983)); *Industra / Matrix Joint Venture v. Pope & Talbot*, 200 Or App 248, 256-57, 113 P3d 961 (2005), *aff'd*, 341 Or 321, 142 P3d 1044 (2006) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 US 614, 626, 105 S Ct 3346, 87 L Ed 2d 444 (1985)); *City & County of Denver*, 939 P2d at 1364 (quoting *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F2d 840, 846 (2d Cir 1987)). Colorado courts follow federal precedent to determine the scope of an arbitration clause by requiring the court to apply the presumption favoring arbitrability and to prohibit litigation "unless the court can say with 'positive assurance' that the arbitration provision is not susceptible of any interpretation that encompasses the subject matter of the dispute." *Jefferson County Sch. Dist. v. Shorey*, 826 P2d 830, 840 (Colo 1992) (quoting *AT & T Technologies, Inc. v. Communications Workers of America*, 475 US 643, 650, 106 S Ct 1415, 1419, 89 L Ed 2d 648 (1986)). A broad or unrestricted arbitration clause makes the "strong presumption favoring arbitration [apply] with even greater force." Martin Domke, *The Law of Practice on Commercial Arbitration* § 12.05 (rev ed supp 1993). DEX asserts that, in light of the breadth of the arbitration clause, the Payment Plan's relationship to the Agreement, and case law favoring liberal enforcement of arbitration provisions, the arbitration clause must be interpreted to encompass the counterclaim.

NMS concedes that the arbitration clause is broad, that the law favors arbitration, and that, generally, all

doubts are to be resolved in favor of arbitration. NMS asserts, however, that a reading of both the Agreement and the Payment Plan shows that the parties did not intend the Payment Plan to be subject to the arbitration clause. NMS contends, further, that the federal law presumption favoring generous interpretations of arbitration clauses does not apply after an agreement has been terminated. Rather, NMS contends, in that circumstance, the scope of application of the arbitration clause is limited to claims arising under the Agreement, and it is clear that NMS's counterclaim does not arise under the Agreement.

Initially, we reject NMS's contention that the presumptions favoring arbitrability of a dispute are inapplicable when, as here, an agreement has been terminated. The cases that NMS cites in support of its position, *see, e.g., Nolde Brothers, Inc. v. Local No. 358*, 430 US 243, 97 S Ct 1067, 51 L Ed 2d 300 (1977), do not bear out the contention. *Nolde Brothers, Inc.*, involved the question whether an employer had a duty to arbitrate severance pay claims that arose after the termination of a collective bargaining agreement. There was no dispute that, had the claim arisen before termination of the agreement, it would have been subject to arbitration. The employer asserted that the termination of the contract terminated the parties' obligation to resolve their disputes through arbitration. The Court treated the issue as one of contract construction. Analyzing the specific language of the parties' agreement, which provided for arbitration of "all grievances," the Court held that the severance pay claims arose under the collective bargaining agreement and therefore fell within the scope of the parties' arbitration agreement and that, even though the underlying collective bargaining agreement had been terminated three days before the employees were terminated and before their claims for severance pay arose, there was no intention expressed in the agreement that the parties' right to arbitration of matters arising under the collective bargaining agreement would terminate with the termination of the agreement. 430 US at 253.

Because *Nolde Brothers, Inc.*, involved arbitration of a collective bargaining agreement, as opposed to a commercial agreement, there are likely different policy considerations that come into play in determining arbitrability. In any

event, we do not read *Nolde Brothers, Inc.*, to establish a limitation on the application of arbitration provisions in terminated contracts or on the presumptions favoring arbitrability. In fact, the Court in *Nolde Brothers, Inc.*, noted the strong federal policy favoring arbitration as a means of resolving collective bargaining disputes. *Id.* at 254. The Court said that, even where the dispute is over a provision of the expired agreement, "the presumptions favoring arbitrability must be negated expressly or by clear implication." *Id* at 255. If anything, *Nolde Brothers, Inc.*, reinforces the principle that the terms of the contract predominate in the determination of arbitrability. Here, the contract expressly provides that the arbitration clause survives termination of the agreement.

NMS's view has as its source, in part, NMS's different interpretation of the Payment Plan. NMS takes the position that the Payment Plan covers obligations that were incurred by NMS before the parties entered into the Agreement and that it is therefore independent from and unrelated to the Agreement. NMS is correct that, although the Payment Plan lists payments received for May and June of 2003 and makes provision for payments in July and August of 2003, it is not clear that those payments relate to obligations that arose after or under the Agreement. However, it is not necessary for us to resolve that question in order to determine whether NMS's counterclaim is subject to arbitration. Under Colorado law, if ambiguities are found in the arbitration agreement, we afford the parties a presumption in favor of arbitration and resolve doubts about the scope of the arbitration clause in favor of arbitration. *Lane v. Urgitus,* 145 P3d 672 (2006), citing *Allen v. Pacheco*, 71 P3d 375, 378 (Colo 2003).

The Payment Plan and the allegations of the counterclaim *plausibly* relate to the parties' relationship under the Agreement, and we conclude for that reason that the counterclaim arguably relates to matters that are covered by the arbitration clause and must therefore be arbitrated. For example, the Payment Plan does not expressly provide that it is limited to obligations incurred by NMS before the Agreement came into effect, and it expressly refers to payments to be made by NMS in July and August 2003, after the Agreement came into effect, plausibly indicating that the obligations were incurred by NMS under the Agreement. It also

expressly requires NMS to "maintain the current balances," a plausible reference to obligations under the Agreement. Additionally, the allegations of the counterclaim charge that DEX cancelled or threatened to cancel unpublished orders that NMS had received; contacted NMS's customers and told them that they did not have to pay NMS; and threatened NMS's customers that they would lose all advertising if they did not reorder their advertising through DEX. Those allegations plausibly relate to DEX's and NMS's relationship and rights under the Agreement. Further, as to the source of damages, NMS alleges that it was unable to continue to make sales, to collect from its customers, and to continue in its business, all of which plausibly depend on the Agreement. We conclude that NMS's counterclaim is subject to arbitration because, as the Payment Plan and allegations of the counterclaim show, the dispute plausibly has its origins in obligations under the Agreement.

■■■■ NMS's remaining arguments address the enforceability of the arbitration clause. NMS asserts that the arbitration clause is unconscionable and thus unenforceable. Unconscionability is a question of law to be decided by the court. *Leprino v. Intermountain Brick Co.*, 759 P2d 835, 836 (Colo App 1988). In order to support a finding of unconscionability, there must be evidence of some overreaching on the part of one of the parties such as that which results from an inequality of bargaining power or under other circumstances in which there is an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to the first party. *See Davis v. M.L.G. Corp.*, 712 P2d 985, 991 (Colo 1986) (citing *McMillion v. McMillion,* 522 P2d 125 (Colo App 1974); *Industrial Products Intern., Inc. v. Emo Trans, Inc.*, 962 P2d 983 (Colo App 1997)). The factors mitigating against enforcement of a contractual provision based on unconscionability are (1) the existence of a standardized agreement executed by parties of unequal bargaining strength; (2) the lack of opportunity to read and become familiar with the document before signing it; (3) the use of fine print in the portion of the contract containing the provision; and (4) the absence of evidence that the provision was commercially reasonable or should reasonably have been anticipated. The court also considers the terms of

the agreement, including substantive unfairness; the relationship of the parties, including factors of assent, unfair surprise, and notice; and all the circumstances surrounding the formation of the contract, including its commercial setting, purpose, and effect. *Davis*, 712 P2d at 991.[4]

In NMS's view, the arbitration clause's unconscionability arises from its one-sidedness. Although the arbitration clause is mutual on its face, requiring both parties to arbitrate, NMS asserts that, viewed in the context of the entire Agreement, the requirement to arbitrate is unilateral, requiring NMS to arbitrate every dispute, but granting to DEX remedial alternatives and decision-making authority the practical effect of which renders illusory the requirement that DEX arbitrate its disputes. For example, DEX has the right to determine whether to accept or reject advertising orders from NMS, and can declare "in its sole discretion" whether the advertising qualifies as national advertising, without having to submit the dispute to an arbitrator. Further, DEX can unilaterally decide whether NMS is in default

---

[4] Oregon law is similar. As recently explained in *Carey v. Lincoln Loan Co.*, 203 Or App 399, 423, 125 P3d 814 (2005), a substantial disparity in bargaining power, combined with terms that are unreasonably favorable to the party with the greater power, may result in a contract or contractual provision being unconscionable. Unconscionability may involve deception, compulsion, or lack of genuine consent, although usually not to the extent that would justify rescission under the principles applicable to that remedy. The substantive fairness of the challenged provision is always an essential issue. *Id.* In the context of a contract between merchants, to establish unconscionability, "it must be shown that the terms of the agreement bear no reasonable relation to the business risks involved and are so one-sided as to be oppressive." *W. L. May Co., Inc. v. Philco-Ford Corp.*, 273 Or 701, 707-08, 543 P2d 283 (1975).

In *Carey*, 203 Or App at 422, we noted that the official commentary to Uniform Commercial Code section 2-302, which is codified as ORS 72.3020, states that, in a commercial setting,

" '[t]he basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract. * * * The principle is one of the prevention of oppression and unfair surprise * * * and not of disturbance of allocation of risks because of superior bargaining power.' "

(quoted in *W. L. May*, 273 Or at 707 (ellipses in original) (court's emphasis deleted)). In Oregon, in determining whether the substantive provisions of a commercial contract are unconscionable, the court looks "to the circumstances existing at the time of the execution of the contract and examine[s] the challenged provisions in the light of both the general commercial background and the special commercial needs of the particular trade involved." *W. L. May*, 273 Or at 707-08.

under the Agreement, and should NMS fail to cure the default, DEX is authorized to contact NMS's clients, without notice to NMS, and substitute its own advertisements in place of those that NMS sold.

DEX responds that there are legitimate commercial reasons why the arbitration clause, viewed in the context of the entire contract and the business necessities of the publishing industry, is not oppressive. For example, in its relationship with NMS, DEX extended credit to NMS for the advertising that NMS placed in DEX's directories and bore the risk that NMS might fail to pay for the advertising placed in DEX's directories. Therefore, it asserts, the exception of collection actions from the duty to arbitrate is justified by DEX's legitimate need for prompt collection of money owed by NMS without the requirement to arbitrate every delinquency. As to the provision of the Agreement that grants to DEX the right unilaterally to reject advertising, DEX explains that it could not carry on its business if it were required to engage in pre-publication arbitration each time NMS challenged a decision to reject its advertising. DEX further explains that the provision of the Agreement allowing DEX to take remedial action on default without the need to arbitrate is commercially reasonable in light of DEX's publication schedule and the risk that DEX assumes by its continual extension of credit to NMS for its advertising.

We conclude that the provision is not unconscionable. Under Colorado law, not every contractual obligation need be mutual as long as each party has provided some consideration for the contract. *McCoy v. Pastorius*, 125 Colo 574, 582, 246 P2d 611 (1952); *Sedalia Land Co. v. Robinson Brick & Tile Co.*, 28 Colo App 550, 552, 475 P2d 351 (1970). The fact that other provisions in the Agreement afford commercially reasonable remedies to DEX, but not to NMS, outside the arbitration process does not make the arbitration provision unconscionable. *Rains v. Foundation Health Systems Life & Health*, 23 P3d 1249, 1255 (Colo App 2001) (arbitration provision is not unenforceable simply because it does not require the defendant to arbitrate as long as each party has provided some consideration for the contract). Here, there is no dispute that each party provided consideration for the Agreement. We accept DEX's rationale in support of its business need for

alternate remedies and agree with DEX that, in light of the relatively equal bargaining positions of the parties and the practical realities of their business relationship, the arbitration clause is not unconscionable.

As an alternative ground for affirmance of the trial court, NMS contends that DEX waived its right to arbitrate NMS's dispute. That issue is properly addressed to the arbitrator. *See Industra / Matrix Joint Venture*, 341 Or at 332.

In summary, we conclude that NMS's counterclaim is subject to arbitration because it is plausibly covered by the arbitration clause, which is not unconscionable.

Reversed and remanded for entry of order compelling arbitration of respondent's counterclaim.